In the Matter of:

**BRENDA SWEETLAND**

**vs.**

**WHEELABRATOR SAUGUS**

---

ANTHONY COGLIANO

January 23, 2023

---



**Bramanti & Lyons**
**Court Reporting, Inc.**
*Realtime all the Time*
**www.bramanti-lyons.com**

92 State St., 8th Floor  •  Boston, Massachusetts 02109
Phone: 617.723.7321

VOLUME:  I

PAGES:  1 - 121

EXHIBITS:  1 - 10

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

NO. 1:21-CV-10759-LTS

- - - - - - - - - - - - - - - - - - x

BRENDA SWEETLAND, on behalf of herself
and all others similarly situated,

     Plaintiff

 vs.

WHEELABRATOR SAUGUS, INC.,

     Defendant

- - - - - - - - - - - - - - - - - - x

     DEPOSITION OF ANTHONY COGLIANO, a
witness called on behalf of the Plaintiff, taken
pursuant to notice before Robert M. Bramanti,
Certified Shorthand Reporter, Registered Merit
Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the offices of
Colonna, Doyle & Simeola, 26 Main Street, third
floor, Lynnfield, Massachusetts, on Monday,
January 23, 2023, commencing at 2:02 p.m.

_____

BRAMANTI & LYONS COURT REPORTING, INC.

REGISTERED PROFESSIONAL REPORTERS

92 STATE ST., 8TH FLOOR, BOSTON, MA. 02109

TEL:  617.723.7321 / FAX:  617.723.7322

www.bramanti-lyons.com

**2**

```
1  APPEARANCES:
2
   Laura L. Sheets, Esq.
3  Liddle Sheets Coulson P.C.
   975 E. Jefferson Avenue
4  Detroit, Michigan 48207
   313.392.0015/lsheets@lsccounsel.com
5  Present via Zoom Videoconferencing
6
   Leo S. Fama, II, Esq.
7  Fama Law Offices
   161 South Main Street, Unit 105
8  Middleton, Massachusetts 01949
   617.387.5900/leo@famalawoffice.com
9  Attorney for Richard Cogliano
   Present in person
10
   Richard A. Oetheimer, Esq.
11 Goodwin Procter LLP
   100 Northern Avenue
12 Boston, Massachusetts 02210
   617.570.1259/roetheimer@goodwinlaw.com
13 Attorney for the Defendant
   Present in person
14
15 ALSO PRESENT:
16 Michael O'Friel, Esq.
   General Counsel, Wheelabrator
17 Present via Zoom Videoconferencing
18
19
20
21
22
23
24
```

**3**

```
1              I N D E X
2  Deposition of:                         Page
3  ANTHONY COGLIANO
4   Examination by Ms. Sheets               4
5   Examination by Mr. Oetheimer           80
6   Further Examination by Ms. Sheets     105
7
8
9
10
11                ------
12
13          E X H I B I T S
14 No.                                    Page
15 1     Deposition Subpoena               4
16 2     Liddle Sheets Letter, 12/22/22    4
17 3     Blank Declaration                 4
18 4     2nd Answers to Interrogatories    4
19 5     Anderson Declaration, 6/11/22     4
20 6     Anderson Declaration, 8/22/22     4
21 7     Wickedlocal.com Article           4
22 8     Itemlive.com Article              4
23 9     Cogliano Declaration             81
24 10    Photo of 8/1/22 Oetheimer Text   89
```

**4**

```
1              P R O C E E D I N G S
2
3       (Deposition Exhibit Nos. 1 - 8
4    premarked for identification.)
5
6       ANTHONY COGLIANO, a witness called for
7  examination by counsel for the Plaintiff, having
8  been first satisfactorily identified by his
9  Massachusetts driver's license, was duly sworn,
10  was examined, and testified as follows:
11
12       MS. SHEETS:  Let the record reflect, this
13  is the deposition of Anthony Cogliano taken
14  pursuant to notice and agreement of counsel to
15  be used for all purposes under the court rules.
16
17  Examination by Ms. Sheets:
18 Q.  Good afternoon, Mr. Cogliano.  I introduced
19  myself before we went on camera here and you
20  have graciously agreed to let me call you
21  Anthony and you are going to call me Laura today
22  just so we can hopefully get through this
23  process as quickly as possible.
24       As you just heard from the court
```

**5**

```
1  reporter, he's going to be taking down
2  everything that's being said here today.  So
3  it's important that we try not to speak over
4  each other, especially given the little bit of
5  lag that we may have in technology.  We will get
6  through this here hopefully as quickly as
7  possible.
8       Can you please state your full name for
9  the record.
10       MR. OETHEIMER:  Laura, how about we -- I
11  make my appearance on the record.
12       MS. SHEETS:  Oh, I'm sorry.
13       MR. OETHEIMER:  I'll start.
14       I'm Richard Oetheimer from Goodwin
15  Procter, representing the defendant,
16  Wheelabrator Saugus, Inc.
17       MR. FAMA:  I'm Leo Fama, representing
18  Anthony Cogliano.
19 A.  And then William Cogliano, Sr.
20 Q.  Okay.  Can you identify your home address for
21  the court reporter, please.
22 A.  27 Serino Way, Saugus, Mass., 01906.
23 Q.  As we talked about, I briefly introduced myself
24  a little bit more casually before we went on
```

**6**

1    camera today.  Is it your understanding that I
2    represent Brenda Sweetland in a putative class
3    action that has been filed on behalf of her and
4    other residents in the area claiming to have the
5    use and enjoyment of their property interfered
6    with by odors and dust from Wheelabrator.  Do
7    you understand that?
8  A.  Yes, I do.
9  Q.  Okay.  I presume at this point you have had an
10     opportunity to meet Mr. Oetheimer in the room,
11     as he put his appearance on the record?
12 A.  Yes.
13 Q.  We established you are represented by counsel
14     today, correct?
15 A.  Yes.
16 Q.  Okay.  Have you ever been deposed before?
17 A.  Yes.
18 Q.  Can you tell me just briefly what that entailed.
19 A.  I was deposed in a -- many times.  One was a
20     larceny suit against me.  I have been deposed
21     for matters regarding my business in the past.
22 Q.  Okay.  Anything else that you can think of
23     sitting here today?
24 A.  No.

**7**

1  Q.  When approximately was the last time you sat for
2     a deposition, ballpark?
3  A.  2017.
4  Q.  Okay.  Have all those issues, the cases, been
5     resolved that you just referenced?
6  A.  Yes.
7  Q.  Okay.  I'm sure that you remember sort of the
8     ground rules, but I'm just going to cover a few
9     of them.
10        One of which we have already touched upon
11     today, which is it's very important that we
12     don't speak over each other so that the court
13     reporter can take down everything that you say.
14        If you give answers such as uh-huhs or
15     uh-uhs, which are normal in daily conversation,
16     I'm going to correct you or the court reporter
17     may, just so that we make sure that we get a yes
18     or no on the record and then it's clear.
19     Understood?
20 A.  Yes.
21 Q.  Okay.  Great.  If you answer my question, I'm
22     going to presume that you understood it.  Okay?
23 A.  Okay.
24 Q.  If at any point it's too wordy or it doesn't

**8**

1    make any sense, you can always ask me to clarify
2    my question and I would be happy to do so.
3    Okay?
4  A.  Sure.
5  Q.  Okay.  The other thing, as I told you, we are
6     trying to get through this as quickly as
7     possible, but if, in fact, at any point you do
8     need to take a break, you can certainly let me
9     know.  Just finish answering the last question
10     that I pose to you and we can take a break at
11     any time.
12 A.  Okay.
13 Q.  The other point may be, since you are
14     represented by counsel today, and since
15     Wheelabrator has an attorney present, as well,
16     you may hear certain objections after I pose a
17     question.  And unless someone, namely your
18     attorney, informs you or instructs you not to
19     answer a question, you just let the objection be
20     made for the record, but then you go ahead and
21     provide an answer.  Understood?
22 A.  Yes.
23 Q.  Okay.  I am having a little bit of difficulty
24     hearing you.  I don't know if -- I can try to

**9**

1    turn things up on my end, but I will let you
2    know if I can't hear anything today.
3        Are there any medications that you are
4    taking today that might impair your ability to
5    give truthful testimony?
6  A.  No.
7  Q.  Great.  Then I'm going to refer you right now to
8     what we have previously before you arrived
9     marked as deposition Exhibit 1.  I don't know --
10     do you want to pull those over.
11        MR. OETHEIMER:  Yeah.
12        MS. SHEETS:  I didn't mean to put you to
13     work.
14 Q.  Take a few minutes and familiarize yourself with
15     that.  When you are done, just let me know.
16 A.  All set.
17 Q.  Have you seen that document before?
18 A.  Yes.
19 Q.  Sorry, yes?
20 A.  Yes.
21 Q.  Okay.  What's your understanding of what this
22     document is?
23 A.  It states that I have to be here for a
24     deposition.

10

1  Q.  Understood.  I'm sure you've been informed by
2      your attorney that we all talked amongst
3      ourselves to figure out a different date that
4      was mutually convenient and that's why we are
5      here today.  And I appreciate that.
6          Are you a licensed lawyer, sir?
7  A.  No.
8  Q.  Okay.  Have you ever attended any law school
9      classes?
10 A.  Yes.
11 Q.  Tell me about that.
12 A.  I went to Mass. School of Law and I was there
13     for two years, 1999 through 2000.
14 Q.  Did you graduate?
15 A.  No.
16 Q.  So you've never taken the bar exam, correct?
17 A.  No.
18 Q.  Do you know, sitting here today, what a class
19     action is?
20 A.  Yes.
21 Q.  Okay.  Generally, tell me what your
22     understanding of that is.
23 A.  So the Sweetlands are trying to get other people
24     in the area to agree with them that there's a

11

1      problem with Wheelabrator and they are trying to
2      get everyone together as a class action to file
3      suit against Wheelabrator.
4  Q.  Okay.  I appreciate that.  You were answering a
5      little bit more specifically.  I was just kind
6      of asking generically what your understanding
7      was.  That's pretty good.
8          Is this an understanding, in terms of
9      what you just said about a class action, is that
10     from attending law school classes?
11 A.  That and television.
12 Q.  Okay.  Do you know sitting here what a putative
13     class member is?
14 A.  Say that again.
15 Q.  A putative class member, do you understand what
16     that is?
17 A.  A class member that's seeking damages.
18         MR. FAMA:  I can't answer.  You answer.
19 Q.  Can you guys hear me?
20 A.  Yes.
21 Q.  Okay.  Do you know if you are a putative class
22     member in this proposed class action?
23         MR. OETHEIMER:  Objection, for the
24     record.

12

1          Notwithstanding two years of law school,
2      I mean, you are asking sort of legal questions.
3      I will object for the record.  But, you know,
4      subject to my objection, if he has an
5      understanding, he can provide it.
6  A.  I don't believe so, no.
7  Q.  Thank you, Anthony.
8          Let's take a look at what's been marked
9      as Exhibit 2, please.
10         MS. OETHEIMER:  I'm going to go through
11     the pile.  I assume they are in order.
12         MS. SHEETS:  Yeah, there's nothing --
13     feel free.
14 Q.  Anthony, same thing, whenever I give you a
15     document today, take your time and read it over
16     and let me know when you've had an opportunity
17     to look at it.
18         MR. OETHEIMER:  Since there's only one
19     set on the table, Laura, could you just identify
20     Exhibit 2 for the record.
21         MS. SHEETS:  Sure.  Let me wait until
22     he's done.
23         MR. OETHEIMER:  Thank you.
24 A.  I'm all set.

13

1  Q.  Okay.  Anthony, I'm going to represent to you
2      that this is a letter on my firm's letterhead,
3      Liddle Sheets Coulson, that was sent on
4      September 22nd to Anthony Cogliano at 27 Serino
5      Way in Saugus, Massachusetts, 01906.
6          Have you seen this document before?
7  A.  I have, yes.
8  Q.  Okay.  Did you receive this at your home?
9  A.  Yes.
10 Q.  Okay.  Did you bring any documents with you
11     today?
12 A.  No.
13 Q.  Did you take a look at your phone for the
14     requests in the letter to see if you had any
15     text messages to anyone regarding the
16     declarations we are going to talk about today?
17 A.  I go through cell phones monthly.  So to find
18     one that was from that time period, I wouldn't
19     -- first of all, I wouldn't have it.  They break
20     and whatnot.  So I don't have any messages at
21     all, any text messages to show you today.
22 Q.  But you did do a search for those, correct?
23 A.  Yes, correct.
24 Q.  Okay.  Are there any documents, aside from the

14

1  declarations that we are going to look at and
2  talk about today, in your possession that
3  involve this lawsuit in any way?
4  A.  No.
5  Q.  Have you ever exchanged any emails with Richard
6  Oetheimer, Wheelabrator's counsel, that's
7  present in the room today?
8  A.  I don't believe so.
9       Yes, I have.  He did send me an email.
10 Q.  Okay.  Do you know approximately when that was?
11 A.  August.
12 Q.  Do you remember what the substance of that email
13 was?
14 A.  The declarations.
15 Q.  What exactly was said in the email?
16 A.  I don't know exactly what was said, but it was
17    along the line to -- we get a set of
18    declarations that I signed and we had to get the
19    people that offered the information to sign them
20    themselves.
21 Q.  Okay.  Anthony, you are going to hear me say
22    things to Richard or Leo during the day you can
23    just ignore.
24       MS. SHEETS:  I'm going to make a request

15

1  on the record, Richard, again, you sent over
2  some emails in the last couple of days.  But I
3  think, in fact, we didn't receive that email.
4  I'm going to be making that on the record that
5  you produce that.
6  Q.  Do you think that was just the one email
7  exchange that you had with Mr. Oetheimer?
8  A.  I believe so.
9       MR. OETHEIMER:  Laura, I don't know if
10    you want me to answer.  I don't believe I
11    emailed him.
12       MS. SHEETS:  No, that's okay.  That's
13    okay.  We will just keep what we've got on
14    there.  If you ever sent it to me, I will find
15    it, but if you haven't, please do.
16       MR. OETHEIMER:  Okay.
17 Q.  (By Ms. Sheets) Have you ever exchanged any
18    emails with any of the declarants --
19 A.  No.
20 Q.  -- who we will be talking about today?  I'm
21    sorry.  Go ahead.
22 A.  No.
23 Q.  Have you ever exchanged any emails with Jack
24    Walsh regarding the declarations?

16

1  A.  No.
2  Q.  So you did do a thorough search to see if you
3  had any documentation that was requested in the
4  letter that's been marked as Exhibit 2, correct?
5  A.  Yes.
6  Q.  Okay.  Thank you.
7       Aside from that, what did you do to
8  prepare for your deposition today?
9  A.  Nothing.
10 Q.  Okay.  Did you have conversations with Mr. Fama?
11 A.  Mr. Fama?
12 Q.  Yes.
13 A.  Yes.
14 Q.  You didn't refresh your recollection and look at
15    any declarations?
16 A.  You asked me if I talked to him today.  I talked
17    to him on Friday.
18 Q.  Okay.  Fair enough.
19       Did you review any of the declarations in
20    advance of your deposition today?
21 A.  A few.
22 Q.  Okay.  Do you remember which ones?
23 A.  I don't.
24 Q.  Okay.  Why did you look at just a few and not

17

1  all?
2  A.  What's that?
3  Q.  Why did you look at just a few and not all of
4  them?
5  A.  I think there was a question regarding
6    signatures on a few that he showed me.
7  Q.  Okay.  Who was that, your counsel?
8  A.  Yes.
9  Q.  Let me be clear for the record, I'm not allowed
10    to and I'm not interested in knowing about any
11    conversations that you had with your attorney.
12    Okay?
13 A.  Okay.
14 Q.  I don't want to get into that.  I can ask
15    specifics about when you talked to him, but not
16    what you talked about.  I just want to make that
17    clear so you don't offer anything in advance of
18    that.
19       Did you discuss your deposition with
20    Mr. Oetheimer?
21 A.  No.
22 Q.  Did you discuss your deposition with Jack Walsh?
23 A.  No.
24 Q.  Did you discuss your deposition with any of the

18

1  declarants?
2  **A.  No.**
3  Q.  Aside from the few declarations that you just
4     talked about, did you review any other documents
5     in anticipation of your deposition?
6  **A.  No.**
7  Q.  Okay.  Are you aware that there were six people
8     recently who sat for their depositions in this
9     case to talk about their declarations?
10 **A.  Yes.**
11 Q.  Did you read any of those deposition
12    transcripts?
13 **A.  No.**
14 Q.  Did you ask to read any of those deposition
15    transcripts?
16 **A.  No.**
17 Q.  Do you know who was deposed?
18 **A.  I know Liz Marchese was deposed, Stephanie**
19    **Fernandez, Craig Serino, John -- I can't think**
20    **of his last name, and Doug Clark.**
21 Q.  Did you talk to any of those individuals you
22    just named after their deposition?
23 **A.  Craig Serino.**
24 Q.  What did Craig have to say?

19

1  **A.  He said it was the most aggravating two hours of**
2     **his life.**
3  Q.  Okay.  Anything else in addition to that?
4  **A.  No.**
5  Q.  He didn't talk to you about what he was asked?
6  **A.  He said he was asked time and time again if his**
7     **signature was on the page.**
8  Q.  Okay.  Did he tell you what his answer was?
9  **A.  He said it was his signature on -- the second**
10    **one was his signature.**
11 Q.  Okay.  Understood.
12    So did you talk to any of the other
13    people that were deposed other than Craig
14    Serino?
15 **A.  John Cooper called me just basically to say the**
16    **same thing.  It was aggravating.**
17 Q.  Okay.  Was that a phone conversation?
18 **A.  He's my neighbor.  I was doing --**
19 Q.  Okay.  How about Mr. Serino, was that a phone
20    conversation?
21 **A.  Yes.**
22 Q.  Okay.  Anybody else outside of those two
23    individuals?
24 **A.  No.**

20

1  Q.  Okay.  Let's take a look at Exhibit No. 3,
2     please.  When you've had a chance to look at it,
3     let me know when you are done.
4  **A.  Okay.**
5  Q.  I'm going to represent for the record here today
6     that this was provided to us by Wheelabrator in
7     response to our discovery request.  It has the
8     caption of the case, Brenda Sweetland versus
9     Wheelabrator Saugus, and down on the bottom
10    right-hand corner there is a stamp, Bates stamp,
11    that says WB Saugus-009630.  Did I get that
12    correctly?
13 **A.  Yes.**
14 Q.  Okay.  Great.  Again, I'm going to represent to
15    you this is something that was provided to us by
16    Wheelabrator throughout the course of this
17    discovery, which we can ask them for documents.
18    Have you seen a copy of this document
19    without the stamp before today?
20 **A.  Yes.**
21 Q.  I'm going to ask some things that will hopefully
22    make this easier.
23    You understand that you are here today to
24    testify about declarations that have been

21

1  produced in the Sweetland case, correct?
2  **A.  Yes.**
3  Q.  You understand people other than you obtained
4     declarations from residents in this case,
5     correct?
6     MR. OETHEIMER:  Objection.
7  **A.  Yes.**
8     MR. OETHEIMER:  Goes to foundation.  I
9  don't know if he did know that.
10    MS. SHEETS:  Okay.
11 Q.  You said yes, Mr. Cogliano?
12 **A.  Yes.**
13 Q.  Okay.  Do you know who those other people were
14    who also went and got resident declarations?
15 **A.  No.**
16 Q.  Then you wouldn't have had any discussions with
17    them about how they went about getting
18    declarations, correct?
19 **A.  No.**
20 Q.  I'm correct?
21 **A.  Yes.  You are correct.  I wish they got all of**
22    **them.**
23 Q.  Okay.  For clarity and convenience, just as I
24    said, in my interest in trying to make this

22

1  process a little bit smoother and quicker here
2  today, when I refer to the declarations today,
3  I'm only talking the declarations that you
4  produced for Wheelabrator. Okay?
5  A. Yes.
6  Q. At some point here, you understand that there
7  were declarations produced by Wheelabrator in
8  July?
9  A. Yes.
10 Q. I'm going to, again for purposes of convenience
11 and clarity, I'm going to refer to those as
12 initial declarations today. Okay?
13 A. Yes.
14 Q. Then again, those are just the declarations that
15 you had some exchange with. Okay?
16 A. Yes.
17 Q. Okay. You understand there's a second set of
18 declarations that Wheelabrator produced to us in
19 August, correct?
20 A. Yes.
21 Q. For purposes of clarity and convenience here
22 today, I'm going to refer to those as
23 supplemental declarations. Okay?
24 A. Yes.

23

1  Q. We have a general understanding here. I'm not
2  talking about anybody else's declarations that
3  were produced in this case, just the ones that
4  we believe you had involvement with.
5  Understood?
6  A. Yes.
7  Q. Then we are going to talk about the first batch
8  of declarations and reference them as initial
9  declarations, okay?
10 A. Yes.
11 Q. The second set as supplemental declarations,
12 understood?
13 A. Yes.
14 Q. Okay. Good. I think that will help hopefully
15 make things go a lot easier.
16    When was the first time that you learned
17 about this lawsuit with Ms. Sweetland against
18 Wheelabrator?
19 A. I believe June.
20 Q. Okay. Of 2022?
21 A. Yes.
22 Q. So you don't have any idea when it was filed,
23 correct?
24 A. No.

24

1  Q. How did you first hear about the case in what
2  you believe to be June of 2022?
3  A. I spoke to a representative of Wheelabrator.
4  They told me what was going on. And I'm not
5  sure if it was Jack Walsh or Jim Conley, I'm not
6  sure which one it was, Michelle Nato, but one of
7  three.
8  Q. When you said they told you about the lawsuit,
9  do you remember a little bit more about what was
10 said?
11 A. They asked me if I knew anyone that -- in the
12 area that could dispute the claims in the case.
13 Q. Okay. That begs my next question.
14    Did you have an understanding at that
15 time what the case was about?
16 A. Yes.
17 Q. Okay. What was your understanding at the time
18 of what this case was about?
19 A. Odors, soot on cars, noise. People having --
20 this facility giving them a poor quality of
21 life.
22 Q. Again, I think you did say this, but just to
23 make sure, you don't recall who that
24 conversation was with when you first heard about

25

1  the case?
2  A. I'm not sure which one it was.
3  Q. Was that conversation the conversation during
4  which someone brought up getting resident
5  declarations from people?
6  A. Yes.
7  Q. Okay. You don't remember who that was. But
8  what specifically did they indicate they wanted
9  you to do?
10 A. They wanted me to see if I could find people
11 that lived close to the facility that don't have
12 any issue with the facility.
13 Q. Okay. And then at that moment were you given
14 what has been marked as Exhibit 3?
15    Again, when I'm talking about Exhibit 3,
16 Wheelabrator has stamped that as part of their
17 document production to us. I'm assuming a copy
18 you would have received at some point does not
19 have that stamp. Just for purposes of clarity,
20 on that particular occasion, is that when you
21 received a copy of Exhibit 3?
22 A. I think I received a copy of them in July. But
23 -- we had talked about the case previous to
24 that.

26

1  Q. Okay. Okay. Fair enough.
2      Before we get into more specifics about
3  that, when you first learned about the lawsuit
4  and talked about the claims that you were made
5  aware of in this case, what were your thoughts
6  about the case?
7  A. Bogus.
8      MR. OETHEIMER: Objection. Vague.
9  A. **I've lived there my whole life. And outside of**
10     **the '70s, I've never had any problem with**
11     **anything from Wheelabrator.**
12         **In the '70s we used to get soot in my**
13     **pool. They installed scrubbers there in the**
14     **'80s, and I've never had a problem, and I own**
15     **property close by. I own another piece of**
16     **property very close to Wheelabrator, but I've**
17     **never had an issue with it.**
18 Q. Okay. At that time were you aware that there
19     were --
20 A. **You froze.**
21 Q. Sorry.
22 A. **You froze for a minute.**
23 Q. You froze, too.
24 A. **Okay.**

27

1      MR. OETHEIMER: You have to start that
2  question from the top.
3  Q. We are talking about when you first learned
4  about the case, did you believe that that claim
5  was only being made by Ms. Sweetland?
6      MR. OETHEIMER: Objection.
7  A. **No.**
8      MR. OETHEIMER: Foundation.
9  A. **If it's a class action, I would think that**
10     **there's more than just her.**
11 Q. Before you had that conversation with whomever
12     in June of 2022 with the Wheelabrator
13     representative, were you in your capacity as a
14     resident of that neighborhood aware that there
15     were people who had been complaining about odors
16     they attribute to the facility?
17 A. **Yes.**
18 Q. Okay. Do you know any of the individuals by
19     name?
20 A. **I don't know who made the claims that -- as part**
21     **of the Sweetland case, but I know people that**
22     **complain about the facility.**
23 Q. Are they people who live in close proximity to
24     you?

28

1  A. **Yes.**
2  Q. Okay. When you say that they had complaints
3     about the facility, what sorts of complaints?
4  A. **They complained about everything. Peter**
5     **Manoogian complains about noise, traffic. You**
6     **know, they -- most people that complain about**
7     **the facility think it's going to go away and**
8     **it's not.**
9  Q. Okay. You are saying that they think the
10     facility is going to go away or the problems
11     with the facility?
12 A. **I think some of them actually believe that**
13     **facility is going away.**
14 Q. Okay. But prior to that conversation in June
15     with Wheelabrator, you were aware that there
16     were people who had complaints of odors that
17     they attribute to the facility, correct?
18     MR. OETHEIMER: Objection.
19 A. **Yes.**
20 Q. Same question, but a little bit different, prior
21     to that conversation in June of 2022, were you
22     aware of people outside -- again, before knowing
23     about this lawsuit -- who had complaints where
24     they attributed dust on their property that they

29

1  thought was coming from Wheelabrator?
2      MR. OETHEIMER: Objection.
3  A. **Yes.**
4  Q. Have you ever seen any data sheets produced by
5     the plaintiff in this Sweetland case?
6  A. **No.**
7      MR. OETHEIMER: I would just say
8  objection without defining what they are. But
9  you haven't seen them. It kind of moots it.
10 Q. Yeah. So when you talked about this
11     conversation in June of 2022, your testimony, I
12     believe, is at the time you don't think you were
13     given the blank declaration, correct?
14 A. **I got the blank declaration in July. In June**
15     **they asked me if I knew anybody and I made some**
16     **phone calls to people over the next few weeks**
17     **and then in July I got the declaration.**
18 Q. Okay. You did just break up there little bit.
19     And I think actually we are going to be hitting
20     on them in the next couple of questions. I
21     don't mean to be redundant, but I'm going to
22     have to ask you this again.
23         Before we get into the specifics of that,
24     aside from the declarants and your lawyer, have

30

1  you talked to anyone about the Sweetland case at
2  any point?
3  **A. I talked to the people that have made the**
4  **declarations.**
5  Q. Aside from them?
6  **A. No.**
7  Q. Okay. Do you know Brenda Sweetland?
8  **A. No.**
9  Q. Do you know where she lives?
10 **A. She lives near the facility.**
11 Q. Okay. But you don't know specifically where she
12 lives?
13 **A. She lives off of Ballard Street. That's all I**
14 **know. I don't know her address.**
15 Q. Okay. So you, I think -- when you were fading
16 in and out there a little bit, you started to
17 talk about how things were rolled out. I want
18 to sort of walk you through that process a
19 little more slowly.
20     If you could take a look at what has been
21 marked as Deposition Exhibit 4. This is a
22 lengthier document. So while you are looking
23 through it, I will identify it for the record
24 because I think it might make this a little bit

31

1  of timelier.
2      I'm going to represent for the record
3  that is entitled Wheelabrator Saugus's
4  Objections and Responses to Plaintiff Second Set
5  of Interrogatories. It is a 20-page document
6  that has a two-page addendum to it. So 22 pages
7  in total.
8      I will tell you that this is a document
9  that was produced, obviously, by Wheelabrator to
10 us, the plaintiff, in response to our discovery
11 requests. Take your time and let me know when
12 you have had an opportunity to look through it.
13     MR. OETHEIMER: Laura, while he's doing
14 that, he's flipping through it, but he's
15 obviously not reading it. It would take him a
16 while. If there are particular answers you want
17 refer him to, then he should have a chance to
18 read them, I think.
19     MS. SHEETS: Oh, absolutely. I plan on
20 doing that. I'm just letting him familiarize
21 himself to see if he's seen it. I don't know.
22     MR. OETHEIMER: Okay.
23     MS. SHEETS: If there's anything
24 specifically, sure, I will give him plenty of

32

1  time to look it over.
2  **A. All set.**
3  Q. Okay. Great.
4      Again, as Richard pointed out, I don't
5  think, unless you are a speed reader, you've had
6  an opportunity to go through it all, but have
7  you ever seen this document before?
8  **A. No.**
9  Q. Now, I'm going to ask you about some specifics
10 again, really to hopefully streamline this
11 process.
12     If you can take a look at page 4 and read
13 interrogatory 3 and the answer.
14 **A. Okay. All set.**
15 Q. All set? Okay.
16     So I really want you to take a look at
17 the third paragraph and the first paragraph is
18 only one sentence, but it's the final paragraph
19 in that answer to interrogatory 3 and going on
20 to page 4 where it says, in part, "Wheelabrator
21 has learned in the course of its investigation
22 that Mr. Walsh made the decision to request
23 assistance from Anthony Cogliano with outreach
24 in Saugus."

33

1      Did I read that correctly?
2  **A. You did.**
3  Q. Do you disagree with that statement?
4  **A. No.**
5  Q. So tell me about that. Do you have any
6  recollection of approximately when Mr. Walsh
7  approached you?
8  **A. Sometime in June of 2022.**
9  Q. Okay. Is that the June meeting that we talked
10 about where you first learned about the
11 Sweetland case?
12 **A. Yes.**
13 Q. At that point you said, I think you testified,
14 he asked if you knew people who you could talk
15 to and you said you made some phone calls,
16 correct?
17 **A. Yes.**
18 Q. Who is Mr. Walsh?
19 **A. Jack, I believe he's a subcontractor that does**
20 **community outreach for Wheelabrator.**
21 Q. When saw "outreach," what does that mean?
22     MR. OETHEIMER: Objection. But you can
23 answer.
24 **A. He gets involved with the community with town**

**34**

1     events.  He's like their personal connection to
2     the town of Saugus.
3   Q.  Okay.  Do you know how long he's held that
4     position?
5         MR. OETHEIMER:  Objection.
6   **A.  I don't.**
7   Q.  Did you know Mr. Walsh only in his capacity as
8     working for Wheelabrator or did you know him
9     personally before this?
10  **A.  Just from working with Wheelabrator.**
11  Q.  Okay.  Have you met with or talked to Mr. Walsh
12     prior to June of 2022 meeting that you had about
13     this particular case?
14  **A.  Not about this case.**
15  Q.  But you had met him before June of 2022,
16     correct?
17  **A.  Correct.**
18  Q.  When, about, would you say you first were
19     introduced to Mr. Walsh?
20  **A.  2019.**
21  Q.  How did that come to be?
22  **A.  I was running for the Board of Selectmen and I**
23     **met the representatives of Wheelabrator.**
24  Q.  Do you know if Mr. Walsh is a lawyer?

**35**

1  **A.  He's not.  To the best of my knowledge, he's**
2     **not.**
3   Q.  Okay.  So I think earlier you testified, and
4     correct me if I'm wrong, that you weren't sure
5     about the June 2022 meeting where you first were
6     learning about this lawsuit.  Now are you having
7     a recollection that was with Mr. Walsh?
8         MR. OETHEIMER:  Objection.  You are
9     referring to it as a meeting.  I don't know if
10     we established it was a meeting or a phone call.
11     Did he testify?  Did I miss that?
12         MS. SHEETS:  I thought he had said he was
13     meeting in person.
14  Q.  Go ahead, Anthony.
15  **A.  I meet with representatives from Wheelabrator on**
16     **a constant basis.  I'm not sure which one of**
17     **them discussed the lawsuit first.**
18  Q.  Okay.  But it was, in fact, Mr. Walsh when you
19     were called approaching you about obtaining
20     declarations, correct?
21  **A.  Mr. Walsh, yeah, he nagged me about the**
22     **declarations to make sure we got them.  So yes.**
23  Q.  Do you know why he reached out to you in
24     particular?

**36**

1         MR. OETHEIMER:  Objection.
2  **A.  Probably because I know quite a few people in**
3     **Saugus.**
4   Q.  Okay.  When you said that he -- and forgive me,
5     I don't remember your exact verbiage -- he had
6     asked you or harangued you to get declarations,
7     what was it that he said to you at the time?
8  **A.  Representatives from Wheelabrator would ask me**
9     **if I spoke to people continuously regarding this**
10     **matter.  I'd say it went on for a month before**
11     **we did the declarations.**
12  Q.  Do you remember who else besides Mr. Walsh at
13     Wheelabrator you would talk to?
14  **A.  Michelle Nato, Jim Conley, and Jack Walsh.**
15  Q.  Okay.  Did you talk to each one of those
16     individuals at some point or another about the
17     declarations, correct?
18         MR. OETHEIMER:  Objection.
19  **A.  Yes.**
20  Q.  Do you remember how you actually got a physical
21     copy of the declaration, the blank declaration?
22  **A.  I got it from Jack Walsh.**
23  Q.  Was that in an email?
24  **A.  Can you repeat that.**

**37**

1   Q.  Sorry.  Was that in an email?
2  **A.  No.**
3   Q.  Did he hand it to you in person?
4  **A.  He did.**
5   Q.  What was your understanding at the time that you
6     received it that these would be used for?
7         MR. OETHEIMER:  Objection.  Foundation.
8  **A.  They would be used for opposition to the claims**
9     **that there's a -- that Wheelabrator's causing an**
10     **issue.**
11  Q.  Okay.  Did you and Mr. Walsh, at the time you
12     received the declaration, go through it and
13     discuss the contents?
14  **A.  Yes.**
15  Q.  What specifically do you remember discussing?
16  **A.  The items listed on, 1 through 6.**
17         MR. OETHEIMER:  I'm handing back Exhibit
18     3.
19         MS. SHEETS:  Sure.
20  **A.  We discussed items 1 through 6 on the**
21     **declaration.**
22  Q.  While you are taking a look at Exhibit 3, can
23     you take a look at the first paragraph under the
24     word Declaration it says, "Pursuant to 28 U.S.C.

38

1    1746, I declare and say."
2        Did I read that correctly?
3  A.  Yes, you did.
4  Q.  Okay.  Did you and Mr. Walsh discuss what that
5    means?
6  A.  No.
7  Q.  Okay.  At the time you received the declaration,
8    do you recall having any idea as to what that
9    was referring to, that specific portion?
10 A.  No.
11 Q.  Sitting here today, do you know what 28 U.S.C.
12   1746 is?
13 A.  No.
14 Q.  Take a look at No. 6 here.  Again, we are
15   looking at Exhibit 3, where it says, "I declare
16   under penalty of perjury that the foregoing is
17   true and correct."
18       Did I read that correctly?
19 A.  Yes, you did.
20 Q.  Did you and Mr. Walsh discuss what that
21   statement meant before you talked to any of the
22   declarants?
23 A.  No.
24 Q.  At the time that you went over 1 through 6 with

39

1    Mr. Walsh, do you recall what your understanding
2    of that specific provision was?
3        MR. OETHEIMER:  Objection.
4  A.  Yes.
5  Q.  Tell me what it was.
6  A.  **It means the person who agrees to the**
7    **declaration attests to the facts that it's true**
8    **and correct.**
9  Q.  Okay.  I kind of asked you past tense there what
10   your understanding was during that particular
11   day of the blank declaration.  Do you have an
12   different understanding what that means today or
13   the same?
14 A.  Same.
15 Q.  Okay.  Let's go back now.  You can put Exhibit 3
16   away here.
17       We are going to go back to Exhibit 4,
18   which are the interrogatory answers.  This time
19   I'm going to direct your attention to page 5 and
20   it's -- you have to actually start at page 4 to
21   look at the question, the bottom of page 4.  I
22   would like you to read interrogatory No. 4 and
23   then Wheelabrator's response to interrogatory
24   No. 4 on page 5.  Let me know when you've had a

40

1    chance to go through that.
2  A.  All set.
3  Q.  Great.  Really, it's just a portion here.  If
4    you look down at the second paragraph here, it
5    says, "Subject to and without waiving its
6    objections, Wheelabrator indicates that there
7    were 41 'initial declarations' served by
8    Wheelabrator with its supplemental Rule 16
9    disclosures on July 12, 2022," correct?
10 A.  Yes.
11 Q.  Do you have any reason to dispute that there
12   were 41 declarations produced by Wheelabrator on
13   July 12th?
14 A.  No.
15 Q.  All right.  Take a look down in answer No. 4.
16   It's the third bullet point down there.  We are
17   still on page 5, which, in part, says, quote,
18   "Anthony Cogliano provided the remaining 22
19   Saugus initial declarations, including his own,
20   which he signed for himself."
21       Did I read that correctly?
22 A.  You did.
23       MR. OETHEIMER:  You did except it's the
24   fourth bullet point, Laura.  You said third.

41

1        MS. SHEETS:  Okay.  Thank you.
2  Q.  I read that correctly.  Do you agree with that
3    statement?
4  A.  I do.
5  Q.  Sitting here today, it's your testimony that you
6    provided Wheelabrator with 22 declarations in
7    this case prior to July 12th, correct?
8  A.  Yes.
9  Q.  Keeping with Exhibit 4, let's take a look at
10   page 11, and take a minute to read the question
11   and answer at the bottom of page 11 and it goes
12   to pages 12, the answer to interrogatory No. 15.
13   Let me know you've had a minute.
14 A.  All set.
15 Q.  Okay.  In this response Wheelabrator states,
16   "Wheelabrator states that Anthony Cogliano has
17   confirmed that he completed, including by
18   signing or entering the names of the declarants,
19   the following 20 initial declarations served by
20   Wheelabrator in July 12, 2022."
21       Did I read that correctly?
22 A.  You did.
23 Q.  Then it lists 20 individuals on the next page.
24   Correct?

**42**

1  A.  Yes.
2  Q.  Do you agree that this response is accurate?
3  A.  Yes.
4  Q.  Okay.  Now, I'm going to show you, and take a
5     look at what has been marked Exhibit 5, please.
6     Take a couple of minutes.
7         While you are looking, I will state for
8     the record, I'm going to represent to you these
9     are declarations that were produced by
10    Wheelabrator to us in connection with this case.
11    I believe that there should be 20 there and when
12    you are done, I'm going to have you double-check
13    it and make sure.
14         MR. OETHEIMER:  Laura, these are all the,
15    quote, 'initial declarations' from June and
16    July?
17         MS. SHEETS:  Correct.
18 A.  There are 20.
19 Q.  Okay.  Great.  I'm sorry.  I'm going to make you
20    leaf back through there again one more time.
21    Because I want to -- Richard already stated
22    this, but I want to make sure we are on the same
23    page here -- pun intended -- if all of these
24    declarations that you have there in Exhibit 5,

**43**

1     those are all dated June and July of 2022,
2     correct?
3  A.  Yes.
4  Q.  Okay.  Keep that handy, but I'm going to flip
5     you back to Exhibit 4, the interrogatory
6     answers.  I want you to go to page 16 and take a
7     minute to read the question and answer to No.
8     21.
9         MR. OETHEIMER:  I'm sorry.
10        MR. FAMA:  16.
11        MS. SHEETS:  Sorry.  It should be 16.
12    Yes.  Page 16, it's interrogatory and answer No.
13    21.
14 Q.  Let me know when you've had a couple of minutes
15    to leaf through that.
16 A.  All set.
17 Q.  Specifically, I want you to take a look at this
18    second paragraph where it states, quote,
19    "Wheelabrator states that it has acknowledged
20    that Anthony Cogliano signed or entered on the
21    initial declarations the names of 20 Saugus
22    residents and, accordingly, the signatures of
23    those 20 Saugus declarants on the initial
24    declarations were not their personal signature."

**44**

1         Did I read that correctly?
2  A.  Yes, you did.
3  Q.  Okay.  Do you agree that this response is
4     accurate?
5  A.  I do.
6  Q.  Okay.  My question here is going to be a little
7     specific.  In looking at Exhibit 5 and these
8     declarations, am I correct in understanding that
9     the information, not the signatures, okay,
10    looking at Exhibit 5, is it your testimony here
11    today that you filled out the blank parts of the
12    declaration contained in Exhibit 5?
13 A.  Yes, I did.
14 Q.  Sorry, I couldn't hear you.
15 A.  Yes, I did.
16 Q.  Okay.  Great.  Then a little bit different but
17    same vein here, it's your testimony here today
18    that you did, in fact, sign each of the
19    declarations contained in Exhibit 5, correct?
20 A.  Yes.
21 Q.  Did you also date the dates in each of the
22    declarations in Exhibit 5?
23 A.  Yes.
24 Q.  Keeping going back to Exhibit 4, the

**45**

1     interrogatory answers, I want you to turn
2     backwards actually and look at page 6.  Take a
3     minute to read the question and the answer to
4     interrogatory No. 6, please.
5  A.  Okay.
6  Q.  In the second paragraph it states in part,
7     "Wheelabrator states, based on information and
8     belief, with respect to the 22 initial
9     declarations provided by Anthony Cogliano, that
10    Anthony Cogliano has indicated he spoke by
11    telephone with 20 Saugus residents named in the
12    initial declarations on or about the dates that
13    appear on the initial declarations that
14    Wheelabrator served on July 12, 2022."
15         Did I read that accurately?
16 A.  Yes.
17 Q.  Okay.  Do you agree that this response is
18    accurate?
19 A.  Yes.
20 Q.  Okay.  When we look back at Exhibit 5 here, is
21    it your testimony here today that the date on
22    each of these declarations is the date that you
23    spoke to the person identified in the
24    declaration?

46

1  A.  Yes.
2  Q.  Okay.  For example, let's take a look at what is
3      your first one and my first one, Steve Anderson?
4  A.  Yes.
5  Q.  Okay.  Down at the bottom there it's dated
6      6/11/2022, correct?
7  A.  Yes.
8  Q.  It's your recollection here that would have been
9      the date that you actually spoke to
10     Mr. Anderson, correct?
11 A.  Yes.
12 Q.  Just to get some timing clear here, when you
13     spoke to the people, the declarants in Exhibit
14     5, did you already at the time you talked to
15     them have a copy of, a blank copy, of the
16     declaration?
17 A.  Yes.
18 Q.  Okay.  How did you choose who to call?
19 A.  I called people that lived near the facility
20     that I know personally.
21 Q.  Okay.  Did you call any people who did not fill
22     out -- who you did not fill out a declaration
23     for?
24 A.  No.

47

1  Q.  Did anyone give you any instruction on who to
2      call?
3  A.  No.
4  Q.  Okay.  Before you decided who you were going to
5      call, did you know who was included in the
6      plaintiff's proposed class?
7          MR. OETHEIMER:  Objection.
8  A.  No.
9  Q.  Sitting here today, do you have any idea who is
10     included in the proposed class?
11         MR. OETHEIMER:  Objection.
12 A.  Just the Sweetlands.
13 Q.  Am I correct in my understanding that the only
14     direction you were given with regard to getting
15     signatures is just getting in touch with as many
16     Saugus people as you could?
17 A.  Yes.
18 Q.  Did you prepare a written script or make any
19     notes of things that you wanted to sort of kind
20     of go through when you made these initial phone
21     calls?
22 A.  No.
23 Q.  Okay.  Was each phone call different?
24 A.  No.

48

1  Q.  They were all the same?
2  A.  Yes.
3  Q.  Tell me what you said.
4  A.  I asked them if they had any problems with odors
5      from Wheelabrator.  Ash on their property.  Is
6      there quality of life hurt by Wheelabrator?
7      That's pretty much what the questions ask.
8  Q.  Okay.  Did you fill out a declaration at the
9      same time you were on the phone with the
10     declarants or was it different for each person?
11         MR. OETHEIMER:  Objection.  You can
12     answer.
13 A.  I believe it was the same time.
14 Q.  Okay.  You believe sitting here today --
15         MS. SHEETS:  Laura, you froze for a
16     minute.  I'm not sure Robert got your whole
17     question.
18 Q.  Do you believe sitting here today that you
19     filled out each declaration contained in Exhibit
20     5 at the time that you spoke to the declarant on
21     the phone?
22 A.  Yes.
23 Q.  Okay.  Do you have any recollection of having a
24     conversation, maybe with someone while you were

49

1      driving or wherever the case may be, where you
2      filled out the declaration later?
3  A.  No.
4  Q.  Did you take any notes memorializing who you
5      talked to?
6  A.  No.
7  Q.  Did you take any notes of people who you wanted
8      to call and needed to call back at a later date?
9  A.  No.
10 Q.  I know you said that you went through some of
11     the information contained on the declaration.
12     But again, if we need to go individually, we
13     certainly can.  But I think we can avoid it
14     depending on your answer to the global question.
15         Do you, sitting here today, have a
16     specific recollection of telling each one of
17     these 20 people that you were calling to garner
18     testimony in a civil lawsuit?
19         MR. OETHEIMER:  Objection.
20 A.  No.
21 Q.  Okay.  It's not your testimony, correct?
22 A.  Correct.
23 Q.  Did you tell any one of those 20 people that you
24     were calling to get testimony for a pending

50

1    civil litigation?
2  A.  I probably told a few people that there was a
3      pending lawsuit against Wheelabrator and I was
4      looking to find out whether or not they have any
5      quality-of-life issues at their home
6      attributable to Wheelabrator.  Which ones I had
7      that conversation with, I don't know.
8  Q.  Okay.  But certainly as you sit here today there
9      were people who you did not have that
10     conversation with, correct?
11 A.  Yes.
12 Q.  Again, is it your testimony, sitting here today,
13     that you told each one of these people that they
14     would be submitting a document that would be put
15     to use in a federal court?
16         MR. OETHEIMER:  Objection.
17 A.  No, I did not.
18 Q.  Do you have any specific recollection, again
19     right now I'm just talking about initial
20     declarations, okay, we will move on later, but
21     as it relates to the initial declarations,
22     sitting here today, is it your testimony that
23     you informed each one of these 20 people that
24     they were signing a document under the penalty

51

1    of perjury?
2  A.  I didn't say that to any of them.
3  Q.  I think this is similar to maybe the first
4      question I asked you, but just to clarify,
5      sitting here today do you have a specific
6      recollection of telling each one of these people
7      that this was a document that was going to be
8      used in a class action lawsuit?
9  A.  No.
10 Q.  But you do have a specific recollection that you
11     asked each and every person if they experienced
12     odors at their property?
13 A.  Yes.
14 Q.  Similarly, do you have a specific recollection
15     of asking each one of those 20 individuals if
16     they experienced dust they attributed to
17     Wheelabrator at their home?
18 A.  Yes.
19 Q.  Sitting here today, did you tell each one of
20     those declarants who you talked to, that signing
21     the document may impact their legal rights?
22 A.  No.
23 Q.  Did you tell each and every person who you
24     talked to on the phone, the 20 original

52

1    declarants, that they had the right to contact
2    attorneys at Liddle Sheets Coulson and ask
3    questions about the lawsuit?
4  A.  No.
5  Q.  Again, I think you talked about this, but your
6      answer is no, you did not convey that to any one
7      of 20 declarants, correct?
8  A.  Say that again.
9  Q.  I just want to make sure because we are covering
10     in broad strokes here 20 different declarations,
11     but it was your testimony you did not inform any
12     one of those 20 people that they had the right
13     to contact lawyers at Liddle Sheets Coulson,
14     correct?
15         MR. OETHEIMER:  Objection.  We are still
16     on the initial declarations, right, Laura?
17         MS. SHEETS:  Correct.
18 Q.  You understood that, Anthony, too, right?  If
19     you have any concern you are not sure what I'm
20     talking about, ask me.  Okay?
21 A.  Yes.
22 Q.  We are on the initial declarations right now.
23         Sitting here today, is it your testimony
24     that, again, as to these initial declarations in

53

1    Exhibit 5, that each one of these 20 people
2    authorized you to sign their names to this
3    declaration?
4          MR. OETHEIMER:  Objection.
5  A.  Yes.
6  Q.  You had permission from each person, each one of
7      these 20 people, to sign their name to these
8      declarations, correct?
9  A.  Yes.
10 Q.  When you had all of these initial declarations
11     completed, who did you turn them over to?
12 A.  Jack Walsh.
13 Q.  Okay.  How did you do that, in person?
14 A.  Yes.
15 Q.  Did you tell Mr. Walsh at the time that you gave
16     them to him that you had signed the
17     declarations?
18 A.  Yes.
19 Q.  Do you remember when that was?
20 A.  No.
21 Q.  But it would have been before July 12th,
22     correct?
23         MR. OETHEIMER:  Objection.
24 A.  No, there's one signed July 2nd.  Did you say

**54**

1      **July 12th or June 12th?**
2   Q.   July 12th.
3   **A.   July, yes.**
4   Q.   We can look back at Exhibit 4.  Looking at
5        interrogatory No. 6, we are talking about the
6        initial declarations, the second paragraph there
7        at the bottom it says, "The initial declarations
8        that Wheelabrator served on July 12th, 2022."
9            So these declarations contained in
10       Exhibit 5 would have been provided to us on July
11       12th.  Understood?
12  **A.   Yes.**
13  Q.   Okay.  My question to you was, obviously if we
14       got them on July 12th, that you had given them
15       to Jack Walsh prior to July 12th, correct?
16  **A.   Yes.**
17  Q.   Do you have any recollection as to when you did
18       that, the date?
19  **A.   No.**
20  Q.   But at that time, you told Mr. Walsh that you
21       had signed the declaration, correct?
22  **A.   Yes.**
23  Q.   Did you tell anyone else at Wheelabrator that
24       you had signed the declaration?

**55**

1   **A.   I told -- yeah, I told several people that I**
2   **     did.**
3   Q.   Such as?
4   **A.   Their attorneys.**
5   Q.   You are indicating Mr. Oetheimer?
6   **A.   Yes.**
7   Q.   Okay.  Anyone else?
8   **A.   I'm not sure if I spoke with Michael O'Friel or**
9   **     not.  I spoke to another attorney.**
10  Q.   Did you tell anyone else, aside from the people
11       you identified, that you personally signed the
12       declarations?
13  **A.   I don't believe so.**
14  Q.   After you turned over the initial declarations
15       and you told Mr. Walsh, amongst others, that you
16       had personally signed the declarations, when was
17       the next time that anyone contacted you about
18       the declarations?
19            MR. OETHEIMER:  Objection.
20  **A.   I'm not sure of the date.**
21  Q.   Do you have a ballpark, August maybe?
22  **A.   Sometime in August.**
23  Q.   Okay.  Do you remember who would have contacted
24       you?

**56**

1   **A.   I think it was Jack.**
2   Q.   What did Jack have to say?
3   **A.   That we had to get the signatures of everybody,**
4   **     their own signature, on the documents.**
5   Q.   Okay.  Did he say why?
6   **A.   Because they had to sign.**
7   Q.   Okay.  Was that the first time that you
8        developed an understanding in your mind that
9        these people needed to sign them personally?
10  **A.   Yes.**
11  Q.   What else did Jack have to say?  Did he indicate
12       how you were to go about obtaining these
13       people's signatures?
14  **A.   He drove me house to house.**
15  Q.   We are obviously going to dive into the
16       supplemental declarations next.  You've been
17       very consistent here.  It looks like you are
18       doing your job.
19            But I prefer to take just a quick break
20       here.  If you don't mind, let's take ten or 15
21       minutes to stretch and we'll come back and then
22       we'll tackle the supplemental ones and I won't
23       be very long.
24  **A.   Fine.**

**57**

1            (Recess taken.)
2   Q.   (By Ms. Sheets) Anthony, you have everything in
3        front of you still?
4   **A.   Yes.**
5   Q.   Okay.  Perfect.  We are back on record, Anthony.
6   **A.   Yes.**
7   Q.   I'll let you get situated.  There is a lot of
8        people.
9            MR. FAMA:  I wanted to make sure he had
10           the same two exhibits in front of him.  That's
11           all.
12           MS. SHEETS:  Okay.  Sure.
13  Q.   I think I touched on this.  I want to make sure
14       I ask it a little more directly.
15           When were you first informed that you
16       would need to go and get supplemental
17       declarations; do you know?
18  **A.   The date, no.**
19  Q.   Do you have any recollection of it being in July
20       or August?
21  **A.   No.**
22  Q.   Again, it was Jack who informed you that you
23       would need to go out and get supplemental
24       declarations?

58

1  A.  Yes.
2  Q.  Was it Jack who said he needed to drive you
3     house to house?
4  A.  Yes.
5  Q.  Did he indicate why?
6  A.  **They wanted to make sure I got the signatures**
7     **from the people that agreed to sign them.**
8  Q.  Okay.  Go back to Exhibit 4 that we've been
9     looking at here today.  Take a look at page 6.
10 A.  Yeah.
11 Q.  Take a minute to look at it.  Again, we probably
12    looked at it earlier.  It's the question and
13    answer to interrogatory No. 6.
14 A.  Okay.
15 Q.  The fourth paragraph down states that, quote,
16    "With respect to the 19 supplemental
17    declarations from Saugus residents served by
18    Wheelabrator on August 30, 2022, all 19 are
19    dated the same date the declarants were
20    approached to sign by Anthony Cogliano."
21    Did I read that correctly?
22 A.  You did.
23 Q.  Do you agree that this response is accurate?
24 A.  Yes.

59

1  Q.  It goes on to say, quote, "Jack Walsh drove
2     Anthony Cogliano from house to house and from
3     his car he was able to observe most, but not
4     all, of the declarants physically sign the
5     supplemental declarations."
6     Did I read that correctly?
7  A.  You did.
8  Q.  Do you agree that this response is accurate?
9  A.  Yes.
10 Q.  Now, let's take a look at what has been marked
11    as Exhibit 6.  While I'm getting that and you
12    are taking a look at that, I'm going to
13    represent to you that these are 20 supplemental
14    declarations referenced in the answer we just
15    looked at and produced to us by Wheelabrator in
16    connection with this case.
17    When you have had a few minutes, let me
18    know.
19    MR. OETHEIMER:  Should be 19, you said 20
20    Laura?
21    MS. SHEETS:  Right, I did say 20.
22    MR. OETHEIMER:  But I'm correct, it's 19?
23    MS. SHEETS:  You are correct.  I think
24    there is a little bit --

60

1     Off the record here, Robert.
2     (Discussion off the record.)
3  Q.  (By Ms. Sheets) You took a look at Exhibit 6,
4     which, for the record, as Richard noted, is
5     actually 19 supplemental declarations that were
6     produced to us by Wheelabrator on August 30th,
7     2022.
8     Have you seen those documents before?
9  A.  Yes.
10 Q.  Okay.  You are in agreement here with me when we
11    go forward and we are talking about supplemental
12    declarations, that we are talking about the
13    declarations contained in Exhibit 6, correct?
14 A.  Yes.
15 Q.  Okay.  You agree with me then that the answer
16    that Wheelabrator gave that the dates on these
17    would have been the dates that you went and
18    obtained the signature from these people,
19    correct?
20 A.  Yes.
21 Q.  I'm jumping around a little bit, but whose
22    decision was it that Mr. Walsh was going to
23    accompany you to obtain signatures?
24 A.  I don't know.

61

1  Q.  He didn't tell you anybody had talked to him
2     about it?
3  A.  **I would imagine it was either their counsel or**
4     **someone else at Wheelabrator.**
5     MR. OETHEIMER:  Move to strike.
6     MS. SHEETS:  Pardon me.
7     MR. OETHEIMER:  I will move to strike.
8     Obviously, he said he doesn't know and then he
9     volunteered speculation.
10 Q.  (By Ms. Sheets) This response says that,
11    "Mr. Walsh observed most, but not all of the
12    declarants physically signing the supplemental
13    declarations," correct?
14 A.  Yes.
15 Q.  Do you know which declarations Mr. Walsh did not
16    observe being physically signed?
17 A.  No.
18 Q.  Did Mr. Walsh talk to any of these people?
19 A.  No.
20 Q.  Do you know why not?
21 A.  What's that?
22    MR. OETHEIMER:  Objection.
23 Q.  Do you know why he did not talk to any of these
24    people?

**62**

1       MR. OETHEIMER: Objection.
2   A.  I thought it was odd to take a chaperone with me
3       to get their signature. He took me to the
4       house. I didn't want to -- I didn't bring him
5       in with me. I walked in some places. Some
6       people came out to the car to sign. Some people
7       I walked in, they signed it, and brought it back
8       out. But I'm not sure which ones are which.
9   Q.  I think you are talking about which ones he may
10      have seen. But do you have any specific
11      recollection of him actually talking to any of
12      the declarants.
13  A.  He did talk to a couple people that came out to
14      the car. He did speak to a few. Which ones, I
15      have no idea.
16  Q.  Okay. Now you know what my next question was.
17      You are anticipating that.
18          Okay. My assessment of these
19      declarations contained in Exhibit 6 show that
20      they were all signed August 22 or August 23rd,
21      correct?
22  A.  Correct.
23  Q.  There is one in there that's kind of a little
24      bit illegible. I don't know. Do you still

**63**

1       think that's the 23rd or not? You want to take
2       a look?
3           MR. OETHEIMER: Which one are you
4       referring us to?
5           MS. SHEETS: I don't know. I'm just
6       asking him if he thinks that's accurate, they
7       were all signed on 8/22 or 8/23?
8           MR. OETHEIMER: You want me to answer?
9   A.  Yes.
10  Q.  Okay. Based on your review of those documents,
11      Anthony, do you agree with me that they are all
12      dated 8/22 or 8/23?
13  A.  Yes.
14  Q.  Okay. I'm going to ask you to go back through
15      them again, but would you agree with me that 18
16      of declarations are dated 8/22.
17  A.  I think 17 are dated 8/22.
18  Q.  Okay. I'm sorry, you said 8/22, not April?
19  A.  8/22.
20  Q.  Okay. You hinted to this a little bit. Did you
21      contact any of these people before showing up in
22      person to obtain their signatures on these
23      supplemental declarations?
24  A.  Yes. All of them.

**64**

1   Q.  All of them. Okay. Did you call each one of
2       them before showing up at their home?
3   A.  Yes.
4   Q.  Okay. What generally did you say?
5   A.  I said I need to get your signature on the --
6       the declarations that I got your permission on
7       the first time, I need your signature on them.
8   Q.  Okay. Sitting here today, is it your testimony
9       that you told each of those people that you had
10      already submitted an initial declaration that
11      you signed on their behalf?
12  A.  Yes.
13  Q.  Okay. When you called these people, I just want
14      to make it clear for the record that we are
15      talking here 19 people, when you called these 19
16      people to go personally obtain their signatures,
17      you informed each one of those people that this
18      was to get their personal signature because you
19      had already submitted a declaration on their
20      behalf that you signed for them; is that
21      correct?
22          MR. OETHEIMER: Objection.
23  A.  Yes.
24  Q.  Do you remember what day you started driving

**65**

1       around with Jack to obtain personal signatures?
2       Would it have been 8/22 given most of them are
3       dated that date?
4   A.  Sounds correct.
5   Q.  Do you remember what time of day you started?
6   A.  No.
7   Q.  Do you remember what time of day you finished?
8   A.  No.
9   Q.  Is it fair to say here, based on what we are
10      looking at though, that you got 17 people to
11      sign on one day, correct?
12  A.  Yes.
13  Q.  Okay. About how much time would you think you
14      spent with each individual getting their
15      signature?
16  A.  A minute.
17  Q.  Okay. Fair to say, then, you didn't go through
18      each statement in the declaration with each
19      person before taking their signature, correct?
20          MR. OETHEIMER: Objection.
21  A.  No, I did not.
22  Q.  Okay. Is it fair to say that -- I know we
23      talked about it -- that you had not said this
24      during the initial phone conversation to get

66

1  their initial declaration.  Is it also fair to
2  say that during that minute meeting with these
3  19 individuals, that you did not discuss with
4  them that signing could affect their rights in
5  pending litigation, correct?
6          MR. OETHEIMER:  Objection.
7  **A.  Correct.**
8  Q.  Did you discuss with any of those 19 individuals
9     at the time that they could confer with Liddle
10    Sheets Coulson about their rights before
11    signing?
12 **A.  No, not one of them.**
13 Q.  If you take a look the supplemental declarations
14    in Exhibit 6, and we talked about this with the
15    initial ones and I want to make sure we are
16    being clear here, did you show up to see these
17    people -- maybe it's different, you can tell me
18    if it was different for different people -- but
19    did you show up with the declaration filled out
20    by you and you just obtained their signatures,
21    or did you show up with blank declarations for
22    them to fill out?
23 **A.  I showed up just asking them for their**
24 **   signature.**

67

1  Q.  Okay.  So if we are looking again, I believe
2     Mr. Anderson is the first person here, his
3     declaration is Exhibit 6, you would have filled
4     out section 1, No. 1?  You would have filled out
5     No. 1, correct?
6  **A.  Correct.**
7  Q.  That's the case for each one of these 19
8     declarations, correct?
9  **A.  Yes.**
10 Q.  Do you have any recollection, would you have
11    already filled out the date for the declaration,
12    as well?
13 **A.  Yes.**
14         MR. OETHEIMER:  Objection.
15 Q.  Sorry.  Yes?
16 **A.  Yes.**
17 Q.  The list of the individuals in Exhibit 4 is a
18    little bit different than the list of
19    supplemental declarations that were provided.  I
20    know there's differences because you were one of
21    the initial declarants and obviously you signed
22    your own declaration.  So you didn't need to
23    supplement that, correct?
24 **A.  Correct.**

68

1  Q.  Okay.  Do you have any recollection of
2     specifically getting Stephanie Fernandez's
3     signature originally?
4  **A.  Originally?**
5  Q.  Correct.
6          First let me back up and ask you.  Who is
7     Ms. Fernandez?  How do you know her?
8  **A.  She's my brother's girlfriend.**
9  Q.  Where, approximately, does she live in relation
10    to this facility?
11 **A.  A mile.**
12 Q.  Okay.
13         MR. FAMA:  It's not in Exhibit 5.
14         MS. SHEETS:  Okay.  Understood.
15 Q.  But sitting here today, do you, Anthony, do you
16    recall getting a declaration from Ms. Fernandez?
17 **A.  Do I recall?  Yes, I do.**
18 Q.  Okay.  Was she one of the people who you called
19    up and got information over the phone and then
20    you filled out a declaration for?
21 **A.  I don't see it in there, so I can't comment if**
22 **   that's her signature or not.**
23 Q.  Okay.  Sitting here today, do you have a
24    specific recollection of getting Ms. Fernandez

69

1     to sign the declaration?
2  **A.  It's her signature on there, yes.**
3  Q.  Okay.  Where exactly are you looking at?  Are
4     you on Exhibit 6?
5  **A.  Yes.**
6  Q.  Or Exhibit 5?
7  **A.  6.**
8  Q.  You are looking at Exhibit 6?
9  **A.  I am.**
10         MR. OETHEIMER:  So you are missing her
11    first declaration?
12         MS. SHEETS:  Correct.
13         MR. OETHEIMER:  I mean, I have a copy of
14    your motion here.
15         MS. SHEETS:  No, it's okay.  I will find
16    it during the break, Richard.  There was, like I
17    said, there was some overlap.  For example, and
18    I will move on here and I will come back to it
19    after we take a break.
20 Q.  You did not get a supplemental declaration from
21    John Russo.
22 **A.  Correct.**
23 Q.  Why not?
24 **A.  Because he said that he worked at the facility**

---

**70**

1    and after thinking about it, he would rather
2    stay out of it.
3  Q.  Okay.  Is he currently working at the facility
4    or used to?
5  A.  Used to.
6  Q.  Have you spoken with any of declarants contained
7    in Exhibit 6 since obtaining their signatures in
8    August?
9  A.  No.  Yeah, I did.  Yes.  I spoke to the people
10   that were deposed, Craig Serino, John Cooper,
11   and I think that's it.
12 Q.  Okay.  Are you currently employed?
13 A.  I am.
14 Q.  Tell me what it is that you do.
15 A.  I own a construction business and I have a real
16   estate license.
17 Q.  You are also on the Board of Selectmen, correct?
18 A.  Yes.
19 Q.  Tell me what that means.  We don't use that same
20   verbiage here in Michigan.
21 A.  Tell you what that means?
22 Q.  Correct.  To be on the Board of Selectmen.
23 A.  I ran for office in 2019.  I was a selectman
24   from 1991 to 2003.  Then I took a 16-year break

---

**71**

1    and ran again in 2019 and got reelected and have
2    been the chairman of the board since 2019.
3  Q.  Is it a paid position?
4  A.  Yes.  I think I make ten cents an hour.  I make
5    $5,000 a year.
6  Q.  Okay.  Understood.
7        In your present position, tell me what
8    your duties are.
9  A.  We are the policymakers for the town of Saugus.
10   We grant licenses.  We appoint the town manager.
11 Q.  Are you going to put yourself up for reelection
12   again?
13 A.  Yes.
14 Q.  When is that?
15 A.  November of 2023.
16 Q.  Okay.  You are also the co-chair of the
17   Wheelabrator subcommittee, correct?
18 A.  Yes.
19 Q.  You were made co-chair by order of a vote,
20   correct?
21 A.  Yes.
22 Q.  Tell me when the subcommittee was formed.
23 A.  It was formed in 2020.
24 Q.  Why?

---

**72**

1  A.  I started the committee to work with
2    Wheelabrator, frustrated that we have lawsuit
3    after lawsuit with the town, lose every single
4    one of them, and my thought was that we should
5    actually work with them and benefit from the
6    company being in Saugus rather than wasting
7    hundreds of thousand dollars on litigation and
8    losing.
9  Q.  You said or basically referenced a lot of
10   litigation.  Specifically, what litigation are
11   you referring to?
12 A.  Landfill closure, problems with the plant.
13 Q.  Were these cases, again that you are
14   specifically referencing, where the town of
15   Saugus was actually suing Wheelabrator?
16 A.  Yes.
17 Q.  Do you know when or the last case that you are
18   talking about would have been filed?
19 A.  There was a case last year.  I don't know the
20   date.  Last year.
21 Q.  Okay.  Understood.  It's your belief that the
22   town lost that case?
23 A.  I believe the town has lost every one of them.
24   So I would imagine we lost that one, too.

---

**73**

1  Q.  But you don't know, sitting here today
2    specifically, why that happened?
3  A.  No.
4  Q.  Do you know if any one of those lawsuits that
5    you are referencing involved any claim of
6    Wheelabrator emanating odors into the
7    neighborhoods?
8  A.  I'm not sure specifically what the cases
9    involved.
10 Q.  So if I asked you the same thing about dust, you
11   wouldn't know, correct?
12 A.  Correct.
13 Q.  Take a look what has been marked as Exhibit 7,
14   please.  While you are looking at it, I will
15   represent that is a newspaper article from
16   Wickedlocal.com entitled Wheelabrator
17   Subcommittee Gets Down to Business and it's
18   dated November 23, 2020.
19 A.  All set.
20 Q.  It is correct when I identified the article is
21   dated November 23, 2020, correct?
22 A.  Yes.
23 Q.  In the third paragraph here of this article, it
24   says here, "As part of that process,

---

**74**

1    Wheelabrator" --
2  A.  Could I stop you for second?  The article that I
3      have here says, "Published November 15, 2021."
4  Q.  You are right.  You are right.  Thank you for
5      correcting that.  Okay.
6          If you look down at the third paragraph
7      it says, "As part of that process, Wheelabrator
8      subcommittee members have raised the possibility
9      of developing a host community agreement between
10      the town and trash-to-energy company."
11          Did I read that correctly?
12  A.  You did.
13  Q.  Okay.  Tell me what this article means when it's
14      talking about a potential host agreement.
15  A.  A host agreement would allow Wheelabrator to
16      continue to dump ash at the landfill in exchange
17      for a monetary figure presented to the town of
18      Saugus.
19  Q.  So is it fair to say then with the host
20      agreement, the town of Saugus would benefit
21      financially from entering into that agreement
22      with Wheelabrator, correct?
23  A.  Yes.
24  Q.  Are you generally in favor of that host

**75**

1      agreement?
2  A.  What's that?
3  Q.  Are you generally in favor of a host agreement?
4  A.  Absolutely.
5  Q.  Take a look at what's been marked as Exhibit 8.
6      When you have a few minutes, let me know when
7      you've had a chance to look through.
8  A.  All set.
9  Q.  Have you seen this article before?
10  A.  I have.
11  Q.  Just for the record, that is a news article that
12      was retrieved off of Itemlive.com.  And it's
13      entitled Saugus Selectmen Opt Not to Vote on the
14      Revised WIN agreement by Charlie McKenna dated
15      January 17, 2023, correct?
16  A.  Yes.
17  Q.  If you look, according to the article in here,
18      the very first paragraph says, "The Board of
19      Selectmen on Tuesday evening opted not to vote
20      on a revised host community agreement with WIN
21      Waste Innovations that allows the company to
22      continue operating its ash landfill in exchange
23      for offering the town free tipping and a lump-
24      sum payment of $1 million pending more details

**76**

1      from the company regarding a contingency clause
2      they sought to re-insert to the agreement."
3          Did I read that correctly?
4  A.  You did.
5  Q.  Just for purposes of clarity for the record
6      here, that paragraph there mentions WIN Waste
7      Innovations, and you agree with me that's one
8      and the same as what we were talking about with
9      Wheelabrator, correct?
10  A.  Yes.
11  Q.  Did you not vote?
12  A.  We voted to table it five to nothing pending
13      more information.
14  Q.  Okay.  What information specifically are you
15      waiting for?
16  A.  They did an extremely horrible job presenting to
17      the board what the new deal would be, and we
18      asked them to go back to the table and give us
19      some facts and figures before making a decision.
20  Q.  Okay.  Can you be a little bit more specific for
21      me in terms of what exactly you would like to
22      see the next time around.
23  A.  I think we are all expecting to see about a
24      million dollars a year plus.

**77**

1  Q.  If, in fact, you agree to the host agreement,
2      correct?
3  A.  I definitely agree to the host agreement.
4  Q.  Okay.  But if it goes through, if it passes,
5      what your expectation is is that it's a million
6      dollar plus every year, correct?
7  A.  I believe the second go-round will be much
8      better than the first one that they got the
9      three votes on.  So I don't think there's going
10      to be a problem passing it.  I just think they
11      did a poor job explaining the new deal.
12  Q.  Okay.  Understood.
13          Do you have any idea when the
14      subcommittee will meet to vote again?
15  A.  This is before the Board of Selectmen.  Now, the
16      subcommittee won't be meeting again until this
17      is approved and then we will start working on
18      other issues.
19  Q.  Okay.  Do you have any expectation of when that
20      will be?
21  A.  I'm hoping January 31st.
22  Q.  Okay.  I'm going to jump around a little bit
23      here.  Go back to Exhibit 5, which I believe
24      here, I might be wrong, are the initial

---

78

1  declarations.
2      Take a look in there, one of the
3  declarations was filled out by Sara Cogliano.
4  You want to find that one specifically.
5  A. Yes.
6  Q. Are you related to Ms. Cogliano?
7  A. Yes, I'm her nephew.
8  Q. You are her nephew?
9  A. Yes.
10  Q. You were breaking up there a little bit.
11      You had a conversation with your aunt on
12  the phone and had her permission to sign her
13  name to the initial declaration before you
14  signed on her behalf, correct?
15  A. Yes.
16  Q. Then do you understand that back during the
17  summer here, we sought to take her deposition?
18  Did you understand that?
19  A. Yes.
20  Q. We were made aware of the fact that she had a
21  medical issue, and I'm sorry to hear that. I
22  hope she is well.
23      Sitting here today, do you have power of
24  attorney for Sara Cogliano?

---

79

1  A. I do.
2  Q. Now I can hear you, but it sounds like you are
3  yelling down a tunnel. Tell me again, please.
4  Shift around a little bit. Do you have a mike
5  on?
6  A. I am the power of attorney for Sara Cogliano.
7  Q. Okay. Were you the power of attorney for Sara
8  Cogliano when you signed her initial
9  declaration?
10  A. I was.
11  Q. Did you produce a supplemental affidavit or
12  declaration for Ms. Cogliano as part of the
13  August supplemental disclosures?
14      MR. OETHEIMER: Can I hand him Exhibit 6?
15      MS. SHEETS: Correct.
16  A. Yes, I did.
17  Q. If you had power of attorney for her, why did
18  you produce a second affidavit?
19  A. I guess I didn't have to.
20  Q. Declaration. Excuse me. I was using the wrong
21  term. Your answer was what?
22  A. I was told to get everyone's signature, so I got
23  hers, too.
24  Q. Is it your testimony sitting here today that she

---

80

1  actually signed that supplemental declaration?
2  A. Absolutely.
3  Q. Okay. Understood. Why don't we take a few
4  minutes. Let me go over my questions. I'm
5  pretty much wrapping up here. Let me look at my
6  notes. We will come back and hopefully get you
7  out of here.
8  A. Okay.
9      (Recess taken.)
10      MS. SHEETS: Anthony, I don't have any
11  further questions today. I don't know if the
12  other two gentlemen sitting there might have
13  some for you, which would mean I get to come
14  back and talk to you again. But we'll see what
15  they have to say.
16      Thank you.
17      MR. OETHEIMER: Okay. All right.
18  Anthony, I do have some questions.
19
20  Examination by Mr. Oetheimer:
21  Q. I think I want to sort of clarify some of the
22  timeline a little bit. I understand you are
23  sort of being asked to sort of recall things,
24  you know, three to six months ago and doing it

---

81

1  from memory and so I want to go back over some
2  of that and I may have some documents that can
3  help sort of refresh you, to some extent, about
4  the timeline here.
5  A. Okay.
6      MR. OETHEIMER: First, why don't I begin,
7  I'm going to mark as Exhibit 9. Laura, it's
8  Anthony's own declaration.
9      (Deposition Exhibit No. 9
10      marked for identification.)
11  Q. Mr. Cogliano, what you have in front of you,
12  Anthony, has been marked as Exhibit 9. It's
13  entitled Declaration. It has your name on it.
14  Let me ask if you can tell us whether that's
15  your signature on Exhibit 9?
16  A. It is.
17  Q. It says executed on -- do you see the date
18  there?
19  A. It says 6/11/22.
20  Q. Earlier you had said that you were approached by
21  Jack Walsh or someone else. I think you may
22  have thought it was Jack Walsh to try to get
23  some declarations and you said that was in June.
24  Then at one point you said you got the form

---

82

1 later in June. At one point you said it may
2 have been July, may have been June.
3        Does looking at Exhibit 9 sort of refresh
4 your memory that you had it at least by June 11,
5 you had the form?
6 A. Correct. It's the day I probably got it.
7 Q. Okay.
8        MS. SHEETS: I sorry. I couldn't hear
9 the last part of your answer.
10       THE WITNESS: I said that's probably the
11 day I got it.
12       MS. SHEETS: Okay. Understood. Thank
13 you.
14 Q. (By Mr. Oetheimer) Before we move on from this,
15 you're obviously a resident of this
16 neighborhood. How far do you live from the
17 plant?
18 A. Less than a mile.
19 Q. You have lived there a long time?
20 A. 56 years. I lived on one street and moved a
21 street over. Between both of them, within a
22 mile of Wheelabrator.
23 Q. Where did you live before living at 27 Serino
24 Way?

83

1 A. 25 Venice Ave. I lived there for the first 25
2 years of my life. First 24 years.
3 Q. Since then you've lived at 27 Serino Way?
4 A. Yes.
5 Q. You say on the form, 31 years?
6 A. Correct.
7 Q. So you filled this out. In addition to
8 soliciting declarations from other residents in
9 the neighborhood, you filled one out yourself
10 because you also are a resident of that
11 neighborhood close to the plant, correct?
12 A. Yes.
13 Q. Let's just go over your statement. It says that
14 you own your home, and do you own your home at
15 27 Serino Way?
16 A. Yes.
17 Q. Two says, "I do not ever notice noxious odors at
18 my home."
19        Is that true?
20 A. Yes.
21 Q. It was true when you signed the statement in
22 June of 2022?
23 A. Yes.
24 Q. Is it still true today?

84

1 A. Yes.
2 Q. Paragraph 3 says, "I do not ever notice unusual
3 or unnatural amounts of dust or ash on my
4 property."
5        Did I read that correctly?
6 A. You did.
7 Q. Was that a true statement at the time you signed
8 this in June?
9 A. Yes.
10 Q. Is it a true statement today?
11 A. Yes.
12 Q. Paragraph 4 reads, "I enjoy numerous activities
13 outside at my property. Neither odors, dust,
14 nor ash has affected my outdoor activities in
15 any way."
16        Did I read paragraph 4 correctly?
17 A. Yes.
18 Q. Was that true at the time you signed the
19 statement in June?
20 A. Yes.
21 Q. Is it true today?
22 A. Yes.
23 Q. What types of outdoor activities do you engage
24 in at your property?

85

1 A. Oh, I had a swimming pool there for years. Just
2 took it away last year. Basketball, played with
3 the kids in the yard when they were little.
4        MS. SHEETS: Forgive me, Anthony, for
5 interrupting. I do want to put an objection,
6 note it on the record here. The scope of this
7 deposition, I think the discovery at this point
8 is limited to obtaining or ascertaining the
9 truth and veracity of the declarations that were
10 provided and not to garner testimony about the
11 use of his property.
12       But sorry if I interrupted you, Anthony.
13       THE WITNESS: No problem.
14       MR. OETHEIMER: I understand. Your
15 objection is noted, but my questions, I think,
16 are seeking to elicit the veracity and accuracy
17 of Mr. Cogliano's declarations. So that seems
18 to be squarely within the scope. But in any
19 event, your objection is noted.
20 Q. (By Mr. Oetheimer) Paragraph 5, Mr. Cogliano,
21 reads, "I do not think odors, dust, or ash have
22 affected my property value."
23       Did I read that correctly?
24 A. You did.

86

1  Q.  Was that something you believed when you signed
2      this on June 11, 2022?
3  A.  I know they haven't affected my property value.
4  Q.  How is it you know that?
5  A.  I'm a licensed real estate agent and I know how
6      much my property is worth today compared to what
7      I bought it for in 1991.
8  Q.  How long have you been a licensed real estate
9      agent?
10 A.  Ten years.
11 Q.  Have you ever listed or sold properties in this
12     neighborhood?
13 A.  Yes.  Let me think which ones.  I listed several
14     properties in the neighborhood.  Mostly --
15     mostly commercial stuff.  But have I listed --
16     no, but I follow along with the real estate,
17     what homes are worth in that neighborhood, and
18     they are pretty significant.
19         There's nothing -- there's nothing that
20     differentiates that part of Saugus from another
21     part.
22 Q.  Have you ever heard appraisers will sort of
23     adjust fair market value for either positive or
24     negative attributes of property, is that your

87

1      understanding?
2  A.  Yes.
3  Q.  Have you ever heard of properties in your Saugus
4      neighborhood west of the plant being sort of
5      given sort of negative value adjustments because
6      of the proximity of Wheelabrator?
7  A.  Never.
8         MS. SHEETS:  Objection.  Richard, none of
9      this is within the scope of what we are here to
10     do today whatsoever.  He already testified that
11     his declaration is accurate and truthful.
12     Anything outside of that is superfluous
13     testimony.  We are here on a very limited scope.
14        MR. OETHEIMER:  All right.  Again, your
15     objections are noted, but I think to determine
16     the accuracy -- I think I can ask questions that
17     go to whether -- establishing the accuracy of
18     his declaration.  That is within the scope.
19        But in any event, I think I have
20     completed my examination concerning
21     Mr. Cogliano's own personal declaration and I
22     will move on to other topics.
23 Q.  (By Mr. Oetheimer)  Now, the initial declarations
24     were in Exhibit 5.  We can get them out again,

88

1      but I understand that you completed them
2      yourself and signed people's names, correct?
3  A.  Yes.
4  Q.  At some point the plaintiff, Ms. Sheets' firm,
5      sought to take depositions of people.  This is
6      back in sort of late July, August time frame.
7      Do you recall learning -- including I think your
8      aunt was one of the four at that point, who was
9      Sara Cogliano and Robert Catinazzo, and if I'm
10     remembering correctly, Richard Nuzzo, and there
11     was a fourth.  But in any event --
12 A.  John Saroufim, I believe.
13 Q.  John Saroufim.
14        Do you recall learning that those people
15     were being sort of asked or called for
16     depositions?
17 A.  Yes.
18 Q.  Did someone from Wheelabrator or on behalf of
19     Wheelabrator contact you to seek an introduction
20     to those people?
21 A.  Yes.
22 Q.  Do you recall who that was?
23 A.  I don't.
24 Q.  You testified on direct from Ms. Sheets that you

89

1      thought you had an email with me at one point.
2      I forget if you said in August or -- I don't
3      know if you said August or July honestly.
4         MR. OETHEIMER:  But let me mark this as
5      Exhibit 10.
6         (Deposition Exhibit No. 10
7         marked for identification.)
8         MR. OETHEIMER:  Laura, you do not have
9      this.  I saw one of the emails we produced there
10     was a reference that I was going to text
11     Mr. Cogliano.  It's a very short text, but I
12     will read it to you in full.
13        It's Monday, August 1, 2022.  "Anthony,
14     this is Richard Oetheimer, Wheelabrator's
15     attorney.  Please call me," and my cell number
16     which I won't put in the record, but it is on
17     the text.
18 Q.  (By Mr. Oetheimer)  Do you recall me reaching out
19     to you in early August?
20 A.  Yes.
21 Q.  Do you recall providing telephone numbers to me
22     for some of the people whose depositions had
23     been noticed?
24 A.  Yes.

90

1  Q.  Do you know whether we ever -- and actually I
2      texted you I think because your voice mail box
3      was full.  I don't think we spoke this day.  But
4      do you recall that you did call me back?
5  A.  Yes.
6  Q.  And provided telephone numbers?
7  A.  Yes.
8  Q.  Do you recall me subsequently contacting you
9      again to ask you about who had signed after I
10     spoke with Mr. Catinazzo, I believe it was?
11 A.  Yes.
12 Q.  I told you that he had told me that he had
13     spoken with you but he hadn't signed the
14     statement?
15 A.  Yes.
16 Q.  Do you recall that?
17 A.  Yes.
18 Q.  Do you know when that conversation occurred?
19 A.  No.
20 Q.  Let me refer you to Exhibit 4.  These are
21     Wheelabrator's interrogatory answers that
22     Ms. Sheets had referred you to earlier.  I'm
23     going to refer you specifically to the page, the
24     bottom of page 14 and top of page 15.  This is

91

1      the answer to interrogatory No. 18.
2          MR. FAMA:  13 and 14?
3  A.  Did you say 14 and 15?
4  Q.  Starting on page 14.
5  A.  Okay.
6  Q.  These are the four people that were noticed for
7      depositions.  I think they were noticed in July,
8      they were scheduled for August 15th.
9          First, in the second paragraph it refers
10     to your aunt, Sara Cogliano.  And it says,
11     "Counsel did not contact Sara Cogliano, as
12     Wheelabrator had been advised by her nephew,
13     Anthony Cogliano, that she had sustained
14     injuries in a fall and would not be able to
15     appear."
16         Is it true that your aunt had sustained
17     injuries in a fall sometime around this time?
18 A.  Yes.
19 Q.  Then it says, the next paragraph says, "Attorney
20     Oetheimer spoke on August 3, 2022, with Richard
21     Nuzzo who said that he was not able to leave his
22     home to attend a deposition due to his poor
23     health."
24         Do you see that?

92

1  A.  Yes.
2  Q.  Do you know whether the statement that Richard
3      Nuzzo in poor health and not able to leave his
4      home, do you know if that's correct?
5  A.  100 percent accurate.
6  Q.  Did you at some point visit Mr. Nuzzo to seek to
7      obtain a statement or declaration from him?
8  A.  Yes.
9  Q.  What is his health condition?  Do you have an
10     understanding?
11 A.  He is obese.
12 Q.  He is morbidly obese?
13 A.  Yes.
14 Q.  And not able to sort of leave his house for
15     mobility.  Have you known Mr. Nuzzo a long time?
16 A.  56 years.
17 Q.  Do you also know his brother Anthony?
18 A.  Yes.
19 Q.  Mr. Nuzzo is one of people who ultimately was
20     deposed, not in August but in December.  He was
21     shown declarations and had some difficulty sort
22     of recognizing or authenticating his signature.
23     Did you get Mr. Nuzzo's signature on a
24     declaration?

93

1  A.  Yes.
2          MS. SHEETS:  Richard, we are talking
3      about the supplemental declaration, correct?
4  Q.  Do you know when you got his signature?
5  A.  It was the second go-round.
6  Q.  The next paragraph on page 14 says that,
7      "Attorney Oetheimer spoke with John Saroufim on
8      August 8th, 2022."
9          Obviously you don't know whether I spoke
10     with Mr. Saroufim or not, correct?
11 A.  I think you told me you did.
12 Q.  You would only know from me?
13 A.  Correct.
14 Q.  In other words, you didn't hear it from him?
15 A.  Right.
16 Q.  I'm not asking you to take my word on this, but
17     it says, "Mr. Saroufim stated," in other
18     words, stated to me, "that he had moved to
19     Florida the month before, i.e., in July of
20     2022."
21         Do you know if he had moved?
22 A.  He has moved.
23 Q.  He was around back at the time you got the
24     initial declarations in June or July, he was

94

1  still here?
2  A.  Correct.
3  Q.  But by August he had moved?
4  A.  Correct.
5  Q.  So you did not go out in August, you were not
6     asked to go out and try to get a new declaration
7     from him because he was no longer here; is that
8     right?
9  A.  I would have loved to have gone to Florida.
10  Q.  Yes.  It's a little hot in Florida in August.
11     Trust me.
12        The next paragraph states that, "Attorney
13     Oetheimer spoke with Richard Catinazzo on August
14     9, 2022."
15  A.  Robert Catinazzo.
16  Q.  Robert Catinazzo.  I'm sorry.
17        It says, "When counsel referenced the
18     statement he signed earlier in the summer 2022,
19     Mr. Catinazzo said he did not sign any
20     statement."
21        On the next page, it says that I had a
22     telephone number for you, do you recall me
23     calling you to tell you that Mr. Catinazzo had
24     said he had not signed the statement?

95

1  A.  Yes.
2  Q.  What did you tell me in response?
3  A.  That I signed it.
4  Q.  Do you recall that shortly after that, we
5     arranged a call with myself and you and the
6     in-house attorney from Wheelabrator, Michael
7     O'Friel, because we wanted to find out basically
8     whether you had signed other statements?
9  A.  Yes.
10  Q.  Do you have a recollection, independent
11     recollection, of when that call was?
12  A.  I don't know the date.
13  Q.  Was it soon after when I spoke with you on
14     August 10th?
15  A.  Yes.
16  Q.  Going back to Exhibit 10, this is kind of a
17     strange message, but do you see the text there,
18     Friday, August 12th?
19  A.  Yes.
20  Q.  "You were on mute."
21        Do you have any recollection -- do you
22     know what that refers to?
23  A.  I don't.
24  Q.  Do you recall having a call with both myself and

96

1     Mr. O'Friel where we asked you about all the
2     declarations?
3  A.  Yes.
4  Q.  Do you have a recollection that at one point
5     earlier in that call you were speaking and you
6     were on mute and we had to tell you to turn on
7     your mike?
8  A.  Did we do a Zoom call?  Is that what it was?
9  Q.  I honestly don't remember, whether it's Zoom,
10     Teams, or a call, but I know we spoke on the
11     morning of the 12th.
12        In any event, whether it was Zoom or
13     Teams, you recall that we had a call and we
14     asked you about the declarations?
15  A.  Yes.
16  Q.  What did you tell us on that call?
17  A.  That I signed them.
18  Q.  Right.  To the best of your knowledge, the call
19     that I had with you on August 10th and then the
20     follow-up call with myself and Michael O'Friel
21     on -- call on August 10th about Mr. Catinazzo's
22     declaration and the follow-up call on August
23     12th where we talked about the other
24     declarations, to the best of your knowledge and

97

1     recollection, was that the first time that the
2     issue of the signatures came up?
3  A.  Yes.
4        MS. SHEETS:  I would just like you to
5     clarify for the record, Richard.  Came up with
6     who?  With you?
7  Q.  (By Mr. Oetheimer) That was the first time that
8     anybody on behalf of Wheelabrator had asked you
9     whose signatures were on those declarations?
10  A.  Correct.
11        MS. SHEETS:  Objection.
12  Q.  Those conversations were with myself and
13     Mr. O'Friel, correct?
14  A.  Yes.
15  Q.  Prior to those conversations, that issue, the
16     issue of who had signed the declarations, had
17     not been discussed by you with me or with
18     Mr. O'Friel?
19  A.  Correct.
20  Q.  Or with Mr. Walsh or anyone else at
21     Wheelabrator?
22  A.  Correct.
23  Q.  On Exhibit 6, which is the so-called
24     supplemental, the August declarations, you were

**98**

1  asked by Ms. Sheets whether they were all signed
2  on August 22nd and 23rd?
3  A.  Yes.
4  Q.  I'm going to refer you -- I have to first hand
5  them back to you.  Before I hand them back to
6  you, do you recall when you first made
7  arrangements to go around and see people, that
8  there were people who sort of were away or
9  weren't available initially?
10 A.  Correct.
11 Q.  Ultimately, John Russo didn't sign, correct?
12 A.  Correct.
13 Q.  For the reasons you stated.  Do you recall
14 whether had he been away initially when you
15 tried to get his signature?
16 A.  I don't recall.
17 Q.  Well, that's understandable.
18     Let me hand you back Exhibit 6.  I'm
19 going to refer you the declaration of Anthony
20 Nuzzo.  Anthony is Richard's brother?
21 A.  Yes.
22 Q.  They live side by side?
23 A.  Yes.
24 Q.  By the way, did they always live at that address

**99**

1  or that location?
2  A.  They did.
3  Q.  Then at some point the family house was --
4  A.  They had probably an 800-square-foot house on
5  that lot and then they tore it down and built a
6  duplex on the lot.
7  Q.  So the brothers are side by side there now?
8  A.  Yes.
9  Q.  But they have lived there all their life?
10 A.  Correct.
11 Q.  Just in a different physical home?
12 A.  Right.
13 Q.  Do you see the date on Anthony Nuzzo's August
14 supplemental declaration?
15 A.  Yes.
16 Q.  Can you read the date?
17 A.  It looks like 8/23 or 8/28, but it's not 8/22.
18 Q.  Okay.  It could be August 28th?
19 A.  It could be.
20 Q.  Do you have any recollection that Mr. Nuzzo was
21 one of the people you sort of had to go back to?
22 A.  Yes.
23 Q.  Because he was not available, for whatever
24 reason, when you first went out to most of the

**100**

1  people?
2  A.  Yes.
3  Q.  If you still have Exhibit 4 in front of you, why
4  don't you read -- I know Ms. Sheets had you do
5  this with several of the interrogatory answers.
6  I'm not sure she did it with this one or not.
7     Why don't you read the answer to
8  interrogatory No. 18, which begins at page 14 in
9  its entirety.  It starts on page 14 and ends
10 towards the bottom of page 15 and take your time
11 to read it and then I will ask you about it.
12 A.  Okay.
13 Q.  I understand that there is some information
14 within interrogatory No. 18 that you wouldn't
15 know.  For example, you don't know when I called
16 Ms. Sheets to tell her about the signature
17 issue, correct?
18 A.  Correct.
19 Q.  You obviously also don't know whether
20 declarations, you don't know anything about
21 declarations obtained from Revere residents,
22 correct?
23 A.  Correct.
24 Q.  But insofar as it relates to things you do know,

**101**

1  is there anything in the answer to interrogatory
2  No. 18 that you disagree with?
3  A.  No.
4  Q.  Insofar as it concerns events that concern you
5  that you were involved in, everything in answer
6  to interrogatory No. 18 is accurate so far as
7  you are aware; is that right?
8  A.  Yes.
9  Q.  Now, just as Ms. Sheets did earlier, I'll ask
10 you some global questions and we can go to
11 individuals if we need to.  But with respect to
12 the August -- Exhibit 6, you still have it in
13 front of you?  These are the August ones.  These
14 were all signed?  Make sure you have Exhibit 6.
15     MR. FAMA:  He does.
16 Q.  So the 19 supplemental declarations in Exhibit
17 6, were those 19 declarations -- and flip
18 through them if you would like to because I want
19 you to confirm -- now you understand that you
20 are under oath today, correct?
21 A.  Yes.
22 Q.  I want you to affirm for the record and for the
23 Court that all 19 of those supplemental
24 declarations were personally physically signed

102

1   by the residents who are named in those
2   declarations?
3  A.  Yes, they are.
4  Q.  You personally obtained all of those signatures?
5  A.  I did.
6  Q.  Mr. Walsh saw some people sign because some
7      people were in their yard or came out to the
8      car, correct?
9  A.  Correct.
10  Q.  Some people he didn't see because you may have
11      gone up to them in the house, correct?
12  A.  Correct.
13  Q.  But you saw everyone sign?
14  A.  Yes.
15  Q.  Did you pressure or coerce anyone to sign?
16  A.  No.
17  Q.  Did you ask anyone to sign as a favor to you?
18  A.  No.
19  Q.  Did you ask anyone to sign saying, like, you had
20      already signed it, and so, you know, you would
21      be in a pickle or a problem if they didn't sign,
22      anything to that effect?
23  A.  I don't recall.
24  Q.  Were you acting in your personal capacity?

103

1  A.  Yes.
2  Q.  As a resident of the neighborhood?
3  A.  Correct.
4  Q.  Did you feel you were asking them as a town
5      official?
6  A.  No.
7  Q.  So you were not doing this in your official
8      capacity?
9  A.  No.
10  Q.  Did you either ask people the questions on the
11      form on Exhibit 3 or ask them to read them?
12  A.  I asked them questions.
13  Q.  Is there anyone who signed who said that they
14      did experience odors?
15  A.  No.
16  Q.  Is there anyone who resisted signing?
17  A.  No.  The only --
18  Q.  Mr. Russo?
19  A.  Mr. Russo.
20  Q.  He just said he wasn't sure if he should because
21      he had worked at Wheelabrator?
22  A.  Correct.
23  Q.  Did Mr. Russo indicate that he had any problems
24      with odors or dust from Wheelabrator?

104

1  A.  No.
2  Q.  Did anyone say they disagreed with anything on
3      the form?
4  A.  No.
5  Q.  Now, on the bottom of the form, you can look at
6      whichever one is in front of you, do you see the
7      triple asterisk at the bottom?
8  A.  Yes.
9  Q.  That was on every document that people signed?
10  A.  Yes.
11  Q.  Did anyone ask you about that?
12  A.  No.
13  Q.  Did you call it to anyone's attention?
14  A.  No.
15  Q.  Did you provide any advice to anyone as to
16      whether they should sign or not sign?
17  A.  No.
18      MR. OETHEIMER:  Why don't we take a
19      moment.  Just take a couple of minutes.  Let's
20      see if I have covered everything I wanted to
21      cover.  I think so.
22      (Recess taken.)
23      MR. OETHEIMER:  Laura, you are up now if
24      you have anything further.

105

1      MS. SHEETS:  Okay.
2      Leo, I'm presuming you don't have any
3  questions?
4      MR. FAMA:  No, I don't have any
5  questions.
6      MS. SHEETS:  Okay.  I just have a couple
7  of follow-ups, Anthony.  I want to make sure I
8  clarify something.
9
10      Examination by Ms. Sheets:
11  Q.  Your testimony earlier today when I asked you,
12      and again we are looking at the first set, okay,
13      not the supplemental, but the first set of
14      declarations, when you had them all filled out,
15      I asked you who you gave those to, correct?
16  A.  Yes.
17  Q.  Your testimony, and correct me if I'm wrong, was
18      that you gave those completed initial
19      declarations to Jack Walsh, correct?
20  A.  I believe so.
21  Q.  Okay.  Today earlier I asked you at the time if
22      you had informed Mr. Walsh that at the time that
23      you gave them to him, that you had signed those
24      declarations and you responded yes.  Do you

106

1   recall that?
2           MR. OETHEIMER:  Objection.
3   A.  I don't know if I told Jack at that time or not.
4       I know I told him, but I don't know when it was.
5   Q.  Okay.  Also, you talked a little bit to Richard
6       about your experience as a real estate agent.  I
7       can appreciate that.
8           Is it your understanding that the claim
9       in our case, if you do understood it at all, is
10      that valuation, property values in the area,
11      have not increased at all over time as a result
12      of the facility's proximity to people homes?
13  A.  Could you repeat the question.
14  Q.  Sure.
15          Is it your understanding that we are
16      claiming in this case that property values have
17      never increased in the area as a result of being
18      a neighbor of Wheelabrator?
19  A.  No, I don't believe anyone would make that
20      statement.  They have never increased over 46
21      years?  I think that would be crazy.
22  Q.  Correct.  Okay.  So you don't have an
23      understanding then that we are alleging that the
24      proximity of the facility in its current state

108

1   Q.  -- by anyone from Wheelabrator?
2   A.  No.
3   Q.  Okay.  Understood.  Thank you.  That's all I
4       have.
5   A.  Let me just rephrase that.
6           I was instructed after the first set that
7       I had to have the people sign them.  That's my
8       instruction.
9           MS. SHEETS:  You are correct.  That's a
10      good clarification.  My question was regarding
11      initial declarations.  Understood.  We are on
12      the same page.
13          Thank you very much for coming today.  I
14      appreciate it.
15          MR. OETHEIMER:  Okay.
16          (Deposition concluded at 4:33 p.m.)
17
18
19
20
21
22
23
24

107

1       is an internal factor that negatively impacts
2       property values, correct?
3   A.  I have no idea what you're claiming.  I can't
4       say that.
5   Q.  Okay.  Understood.  Your experience as a real
6       estate agent, have you ever done a mass
7       appraisal?
8   A.  I don't do appraisals.
9   Q.  In your experience as a real estate agent, have
10      you ever looked at a stigma as an external
11      factor that would negatively impact property
12      values?
13  A.  No.
14  Q.  Okay.  The only other thing I wanted to ask you
15      is, again after your testimony here today, it
16      sounds to me, again, correct me if I'm wrong,
17      that you were talked to by several people and
18      asked about getting these declarations done for
19      Wheelabrator, correct?
20  A.  Yes.
21  Q.  At any point were you ever given any instruction
22      or direction as to how to get those declarations
23      signed --
24  A.  No.

109

1                    CERTIFICATE
2
3
4           I, ANTHONY COGLIANO, do hereby
    certify that I have read the foregoing
5   transcript of my testimony, and I further
    certify that said transcript is a true and
6   accurate record of said testimony.
7
            Signed under the penalties of perjury
8   this        day of          , 2023.
9
10
11
12                    ANTHONY COGLIANO
13
14
15
16
17
18
19
20
21
22
23
24

```
                              110
 1                 CERTIFICATE
 2
 3  COMMONWEALTH OF MASSACHUSETTS )
                                  )  ss.
 4  COUNTY OF MIDDLESEX           )
 5
            I, Robert M. Bramanti, Registered
 6  Merit Reporter and Notary Public within and for
    the Commonwealth of Massachusetts, do hereby
 7  certify:
 8          That, ANTHONY COGLIANO, the witness
    whose deposition is hereinbefore set forth, was
 9  duly sworn by me, and that the foregoing
    transcript is a true record of the testimony
10  given by such witness.
11          I further certify that I am not
    related to any of the parties in this matter by
12  blood or marriage, and that I am in no way
    interested in the outcome of this matter.
13
            IN WITNESS WHEREOF, I have
14  hereunto set my hand and seal this   31st   day
    of   January      2023.
15
16
17              B.Ct.M. Bramanti.
                Notary Public
18
19
    My Commission expires:
20  September 9, 2027
21
22
23
24
```

```
                              111
           E R R A T A   S H E E T

PAGE, LINE   AS TRANSCRIBED       CORRECTION

----------  --------------------------------

----------  --------------------------------

----------  --------------------------------

----------  --------------------------------

----------  --------------------------------

----------  --------------------------------

----------  --------------------------------

----------  --------------------------------

----------  --------------------------------

----------  --------------------------------

----------  --------------------------------

----------  --------------------------------

----------  --------------------------------

----------  --------------------------------

----------  --------------------------------

----------  --------------------------------

----------  --------------------------------

----------  --------------------------------

----------  --------------------------------

          ANTHONY COGLIANO      DATE
```

86:2

**Exhibits**

**Ex 1 Cogliano** 9:9

**Ex 2 Cogliano**
12:9,20 16:4

**Ex 3 Cogliano**
20:1 25:14,15,21
37:17,18,22 38:15
39:15 103:11

**Ex 4 Cogliano**
30:21 39:17 41:9
43:5 44:24 54:4
58:8 67:17 90:20
100:3

**Ex 5 Cogliano**
42:5,24 44:7,10,12,
19,22 45:20 46:13,
14 48:19,20 53:1
54:10 68:13 69:6
77:23 87:24

**Ex 6 Cogliano**
59:11 60:3,13 62:19
66:14 67:3 69:4,8
70:7 79:14 97:23
98:18 101:12,14,16,
17

**Ex 7 Cogliano**
73:13

**Ex 8 Cogliano**
75:5

**Ex 9 Cogliano**
81:7,9,12,15 82:3

**Ex 10 Cogliano**
89:5,6 95:16

**$**

**$1** 75:24

**$5,000** 71:5

**0**

**01906** 5:22 13:5

**1**

**1** 4:3 9:9 37:16,20
38:24 67:4,5 89:13

**10** 89:5,6 95:16

**100** 92:5

**10th** 95:14 96:19,21

**11** 41:10,11 82:4

**12** 40:9 41:12,20
45:14

**12th** 40:13 41:7
53:21 54:1,2,8,11,
14,15 95:18 96:11,
23

**13** 91:2

**14** 90:24 91:2,3,4
93:6 100:8,9

**15** 41:12 56:20 74:3
90:24 91:3 100:10

**15th** 91:8

**16** 40:8 43:6,10,11,
12

**16-year** 70:24

**17** 63:17 65:10
75:15

**1746** 38:1,12

**18** 63:15 91:1 100:8,
14 101:2,6

**19** 58:16,18 59:19,
22 60:5 64:15 66:3,
8 67:7 101:16,17,23

**1991** 70:24 86:7

**1999** 10:13

**2**

**2** 12:9,20 16:4

**20** 41:19,23 42:11,
18 43:21,23 45:11
49:17,23 50:23
51:15,24 52:7,10,12
53:1,7 59:13,19,21

**20-page** 31:5

**2000** 10:13

**2003** 70:24

**2017** 7:3

**2019** 34:20 70:23
71:1,2

**2020** 71:23 73:18,
21

**2021** 74:3

**2022** 23:20 24:2
27:12 28:21 29:11
33:8 34:12,15 35:5
40:9 41:20 43:1
45:14 54:8 58:18
60:7 83:22 86:2

89:13 91:20 93:8,20
94:14,18

**2023** 71:15 75:15

**21** 43:8,13

**22** 31:6 40:18 41:6
45:8 62:20

**22nd** 13:4 98:2

**23** 73:18,21

**23rd** 62:20 63:1
98:2

**24** 83:2

**25** 83:1

**27** 5:22 13:4 82:23
83:3,15

**28** 37:24 38:11

**28th** 99:18

**2nd** 53:24

**3**

**3** 20:1 25:14,15,21
32:13,19 37:18,22
38:15 39:15 84:2
91:20 103:11

**30** 58:18

**30th** 60:6

**31** 83:5

**31st** 77:21

**4**

**4** 30:21 32:12,20
39:17,20,21,22,24
40:15 41:9 43:5
44:24 54:4 58:8
67:17 84:12,16
90:20 100:3

**41** 40:7,12

**46** 106:20

**4:33** 108:16

**5**

**5** 39:19,24 40:17
42:5,24 44:7,10,12,
19,22 45:20 46:14
48:20 53:1 54:10
68:13 69:6 77:23
85:20 87:24

**56** 82:20 92:16

**6**

**6** 37:16,20 38:14,24
45:2,4 54:5 58:9,13
59:11 60:3,13 62:19
66:14 67:3 69:4,7,8
70:7 79:14 97:23
98:18 101:12,14,17

**6/11/2022** 46:6

**6/11/22** 81:19

**7**

**7** 73:13

**70s** 26:10,12

**8**

**8** 4:3 75:5

**8/22** 63:7,12,16,17,
18,19 65:2 99:17

**8/23** 63:7,12 99:17

**8/28** 99:17

**800-square-foot**
99:4

**80s** 26:14

**8th** 93:8

**9**

**9** 81:7,9,12,15 82:3
94:14

**A**

**ability** 9:4

**absolutely** 31:19
75:4 80:2

**accompany** 60:23

**according** 75:17

**accordingly** 43:22

**accuracy** 85:16
87:16,17

**accurate** 42:2 44:4
45:18 58:23 59:8
63:6 87:11 92:5
101:6

**accurately** 45:15

**acknowledged**
43:19

**acting** 102:24

**action** 6:3 10:19
11:2,9,22 27:9 51:8

**activities** 84:12,14,
23

**actually** 28:12
29:19 36:20 39:20
45:2 46:9 60:5
62:11 72:5,15 80:1
90:1

**addendum** 31:6

**addition** 19:3 83:7

**address** 5:20 30:14
98:24

**adjust** 86:23

**adjustments** 87:5

**advance** 16:20
17:17

**advice** 104:15

**advised** 91:12

**affect** 66:4

**affected** 84:14
85:22 86:3

**affidavit** 79:11,18

**affirm** 101:22

**after** 8:16 18:22
55:14 69:19 70:1
72:3 90:9 95:4,13
107:15 108:6

**afternoon** 4:18

**again** 11:14 15:1
19:6 20:14 22:10,14
24:22 25:15 28:22
29:22 32:4,10 38:14
42:20 49:12 50:12,
18 52:5,8,24 57:22
58:11 63:15 67:1
71:1,12 72:13
77:14,16 79:3 80:14
87:14,24 90:9
105:12 107:15,16

**against** 6:20 11:3
23:17 50:3

**agent** 86:5,9 106:6
107:6,9

**aggravating** 19:1,
16

**agree** 10:24 41:2
42:2 44:3 45:17
58:23 59:8 60:15
63:11,15 76:7 77:1,
3

**agreed** 4:20 58:7

**agreement** 4:14 60:10 74:9,14,15, 20,21 75:1,3,14,20 76:2 77:1,3

**agrees** 39:6

**ahead** 8:20 15:21 35:14

**alleging** 106:23

**allow** 74:15

**allowed** 17:9

**allows** 75:21

**always** 8:1 98:24

**amongst** 10:2 55:15

**amounts** 84:3

**Anderson** 46:3,10 67:2

**another** 26:15 36:16 55:9 86:20

**answer** 7:21 8:19, 21 11:18 15:10 19:8 32:13,19 33:23 40:15 41:11,12 43:7,12 45:3 48:12 49:14 52:6 58:13 59:14 60:15 63:8 79:21 82:9 91:1 100:7 101:1,5

**answering** 8:9 11:4

**answers** 7:14 31:16 39:18 43:6 45:1 90:21 100:5

**Anthony** 4:6,13,21 5:18 12:7,14 13:1,4 14:21 32:23 35:14 40:18 41:16 43:20 45:9,10 52:18 57:2, 5 58:20 59:2 63:11 68:15 80:10,18 81:12 85:4,12 89:13 91:13 92:17 98:19, 20 99:13 105:7

**Anthony's** 81:8

**anticipating** 62:17

**anticipation** 18:5

**anyone's** 104:13

**appear** 45:13 91:15

**appearance** 5:11 6:11

**appoint** 71:10

**appraisal** 107:7

**appraisals** 107:8

**appraisers** 86:22

**appreciate** 10:5 11:4 106:7 108:14

**approached** 33:7 58:20 81:20

**approaching** 35:19

**approved** 77:17

**approximately** 7:1 14:10 33:6 68:9

**April** 63:18

**area** 6:4 10:24 24:12 106:10,17

**arranged** 95:5

**arrangements** 98:7

**arrived** 9:8

**article** 73:15,20,23 74:2,13 75:9,11,17

**ascertaining** 85:8

**ash** 48:5 74:16 75:22 84:3,14 85:21

**assessment** 62:18

**assistance** 32:23

**assume** 12:11

**assuming** 25:17

**asterisk** 104:7

**attend** 91:22

**attended** 10:8

**attending** 11:10

**attention** 39:19 104:13

**attests** 39:7

**attorney** 8:15,18 10:2 17:11 55:9 78:24 79:6,7,17 89:15 91:19 93:7 94:12 95:6

**attorneys** 52:2 55:4

**attributable** 50:6

**attribute** 27:16 28:17

**attributed** 28:24 51:16

**attributes** 86:24

**August** 14:11 22:19 55:21,22 57:20 58:18 60:6 62:20 70:8 79:13 88:6 89:2,3,13,19 91:8,20 92:20 93:8 94:3,5,10,13 95:14, 18 96:19,21,22 97:24 98:2 99:13,18 101:12,13

**aunt** 78:11 88:8 91:10,16

**authenticating** 92:22

**authorized** 53:2

**available** 98:9 99:23

**Ave** 83:1

**avoid** 49:13

**aware** 18:7 26:5,18 27:14 28:15,22 78:20 101:7

**B**

**back** 37:17 39:15, 17 42:20 43:5 44:24 45:20 49:8 54:4 56:21 57:5 58:8 62:7 63:14 68:6 69:18 76:18 77:23 78:16 80:6,14 81:1 88:6 90:4 93:23 95:16 98:5,18 99:21

**backwards** 45:2

**Ballard** 30:13

**ballpark** 7:2 55:21

**bar** 10:16

**based** 45:7 63:10 65:9

**basically** 19:15 72:9 95:7

**basis** 35:16

**Basketball** 85:2

**batch** 23:7

**Bates** 20:10

**before** 4:19 5:24 6:16 9:8,17 13:6 20:19 26:2 27:11

28:22 29:23 32:7 34:9,15 36:10 38:21 47:4 53:21 60:8 63:21 64:2 65:19 66:10 75:9 76:19 77:15 78:13 82:14, 23 93:19 98:5

**begin** 81:6

**begins** 100:8

**begs** 24:13

**behalf** 6:3 64:11,20 78:14 88:18 97:8

**belief** 45:8 72:21

**believe** 12:6 14:8 15:8,10 23:4,19 24:2 27:4 28:12 29:12 33:19 42:11 48:13,14,18 55:13 67:1 72:23 77:7,23 88:12 90:10 105:20 106:19

**believed** 86:1

**benefit** 72:5 74:20

**between** 74:9 82:21

**bit** 5:4,24 8:23 11:5 22:1 24:9 28:20 29:18 30:16,24 44:16 59:24 60:21 62:24 63:20 67:18 76:20 77:22 78:10 79:4 80:22 106:5

**blank** 29:13,14 36:21 39:11 44:11 46:15 66:21

**board** 34:22 70:17, 22 71:2 75:18 76:17 77:15

**Bogus** 26:7

**both** 82:21 95:24

**bottom** 20:9 39:21 41:11 46:5 54:7 90:24 100:10 104:5, 7

**bought** 86:7

**box** 90:2

**break** 8:8,10 13:19 29:18 56:19 69:16, 19 70:24

**breaking** 78:10

**Brenda** 6:2 20:8 30:7

**briefly** 5:23 6:18

**bring** 13:10 62:4

**broad** 52:10

**brother** 92:17 98:20

**brother's** 68:8

**brothers** 99:7

**brought** 25:4 62:7

**built** 99:5

**bullet** 40:16,24

**business** 6:21 70:15 73:17

**C**

**call** 4:20,21 35:10 46:18,21 47:2,5,23 49:8 64:1 89:15 90:4 95:5,11,24 96:5,8,10,13,16,18, 20,21,22 104:13

**called** 4:6 19:15 35:19 46:19 64:13, 15 68:18 88:15 100:15

**calling** 49:17,24 94:23

**calls** 29:16 33:15 47:21

**camera** 4:19 6:1

**capacity** 27:13 34:7 102:24 103:8

**caption** 20:8

**car** 59:3 62:6,14 102:8

**cars** 24:19

**case** 18:9 20:8 21:1,4 23:3 24:1,12, 15,18 25:1,23 26:5, 6 27:4,21 29:5 30:1 33:11 34:13,14 41:7 42:10 49:1 59:16 67:7 72:17,19,22 106:9,16

**cases** 7:4 72:13 73:8

**casually** 5:24

**Catinazzo** 88:9 90:10 94:13,15,16, 19,23

**Catinazzo's** 96:21

**causing** 37:9

**cell** 13:17 89:15

**cents** 71:4

**certain** 8:16

**certainly** 8:8 49:13 50:8

**chairman** 71:2

**chance** 20:2 31:17 40:1 75:7

**chaperone** 62:2

**Charlie** 75:14

**choose** 46:18

**civil** 49:18 50:1

**claim** 27:4 73:5 106:8

**claiming** 6:4 106:16 107:3

**claims** 24:12 26:4 27:20 37:8

**clarification** 108:10

**clarify** 8:1 51:4 80:21 97:5 105:8

**clarity** 21:23 22:11, 21 25:19 76:5

**Clark** 18:20

**class** 6:2 10:18 11:2,9,13,15,17,21, 22 27:9 47:6,10 51:8

**classes** 10:9 11:10

**clause** 76:1

**clear** 7:18 17:9,17 46:12 64:14 66:16

**close** 25:11 26:15, 16 27:23 83:11

**closure** 72:12

**co-chair** 71:16,19

**coerce** 102:15

**Cogliano** 4:6,13,18 5:18,19 13:4 21:11 32:23 40:18 41:16 43:20 45:9,10 58:20 59:2 78:3,6,24 79:6, 8,12 81:11 85:20 88:9 89:11 91:10, 11,13

**Cogliano's** 85:17 87:21

**comment** 68:21

**commercial** 86:15

**committee** 72:1

**community** 33:20, 24 74:9 75:20

**company** 72:6 74:10 75:21 76:1

**compared** 86:6

**complain** 27:22 28:6

**complained** 28:4

**complaining** 27:15

**complains** 28:5

**complaints** 28:2,3, 16,23

**completed** 41:17 53:11 87:20 88:1 105:18

**concern** 52:19 101:4

**concerning** 87:20

**concerns** 101:4

**concluded** 108:16

**condition** 92:9

**confer** 66:9

**confirm** 101:19

**confirmed** 41:17

**Conley** 24:5 36:14

**connection** 34:1 42:10 59:16

**consistent** 56:17

**constant** 35:16

**construction** 70:15

**contact** 52:1,13 63:21 88:19 91:11

**contacted** 55:17, 23

**contacting** 90:8

**contained** 44:12, 19 48:19 49:11 54:9 60:13 62:19 70:6

**contents** 37:13

**contingency** 76:1

**continue** 74:16 75:22

**continuously** 36:9

**convenience** 21:23 22:10,21

**convenient** 10:4

**conversation** 7:15 19:17,20 24:24 25:3 27:11 28:14,21 29:11 48:24 50:7,10 65:24 78:11 90:18

**conversations** 16:10 17:11 97:12, 15

**convey** 52:6

**Cooper** 19:15 70:10

**copy** 20:18 25:17, 21,22 36:21 46:15 69:13

**corner** 20:10

**correct** 6:14 7:16 10:16 13:22,23 16:4 21:1,5,18,20,21 22:19 23:23 28:17 29:13 33:16 34:16, 17 35:4,20 36:17 38:17 39:8 40:9 41:7,24 42:17 43:2 44:8,19 46:6,10 47:13 49:21,22 50:10 52:7,14,17 53:8,22 54:15,21 59:22,23 60:13,19 61:13 62:21,22 64:21 65:4,11,19 66:5,7 67:5,6,8,23, 24 68:5 69:12,22 70:17,22 71:17,20 73:11,12,20,21 74:22 75:15 76:9 77:2,6 78:14 79:15 82:6 83:6,11 88:2 92:4 93:3,10,13 94:2,4 97:10,13,19, 22 98:10,11,12 99:10 100:17,18,22, 23 101:20 102:8,9, 11,12 103:3,22 105:15,17,19 106:22 107:2,16,19 108:9

**correcting** 74:5

**correctly** 20:12 33:1 38:2,18 40:21 41:2,21 44:1 58:21 59:6 74:11 76:3

84:5,16 85:23 88:10

**Coulson** 13:3 52:2, 13 66:10

**counsel** 4:7,14 6:13 8:14 14:6 17:7 61:3 91:11 94:17

**couple** 15:2 29:20 42:6 43:14 62:13 104:19 105:6

**course** 20:16 32:21

**court** 4:15,24 5:21 7:12,16 50:15 101:23

**cover** 7:8 104:21

**covered** 104:20

**covering** 52:9

**Craig** 18:19,23,24 19:13 70:10

**crazy** 106:21

**current** 106:24

**currently** 70:3,12

---

**D**

**daily** 7:15

**damages** 11:17

**data** 29:4

**date** 10:3 44:21 45:21,22 46:9 49:8 54:18 55:20 57:18 58:19 65:3 67:11 72:20 81:17 95:12 99:13,16

**dated** 43:1 46:5 58:19 63:12,16,17 65:3 73:18,21 75:14

**dates** 44:21 45:12 60:16,17

**day** 14:22 39:11 64:24 65:5,7,11 82:6,11 90:3

**days** 15:2

**deal** 76:17 77:11

**December** 92:20

**decided** 47:4

**decision** 32:22 60:22 76:19

**declarant** 48:20

**declarants** 15:18

18:1 29:24 38:22 41:18 43:23 46:13 48:10 51:20 52:1,7 58:19 59:4 61:12 62:12 67:21 70:6

**declaration** 29:13, 14,17 36:21 37:12, 21,24 38:7 39:7,11 44:12 45:24 46:16, 22 48:8,19 49:2,11 53:3 54:21,24 64:10,19 65:18 66:1,19 67:3,11,22 68:16,20 69:1,11,20 78:13 79:9,12,20 80:1 81:8,13 87:11, 18,21 92:7,24 93:3 94:6 96:22 98:19 99:14

**declarations** 13:16 14:1,14,18 15:24 16:15,19 18:3,9 20:24 21:4, 14,18 22:2,3,7,12, 14,18,23 23:2,8,9, 11 25:5 30:4 35:20, 22 36:6,11,17 40:7, 12,19 41:6,19 42:9, 15,24 43:21,24 44:8,19,22 45:9,12, 13,22 50:20,21 52:10,16,22,24 53:8,10,17 54:6,7,9 55:12,14,16,18 56:16 57:17,24 58:17 59:5,14 60:5, 12,13 61:13,15 62:19 63:16,23 64:6 66:13,21 67:8,19 78:1,3 81:23 83:8 85:9,17 87:23 92:21 93:24 96:2,14,24 97:9,16,24 100:20, 21 101:16,17,24 102:2 105:14,19,24 107:18,22 108:11

**declare** 38:1,15

**defendant** 5:15

**defining** 29:8

**definitely** 77:3

**depending** 49:14

**deposed** 6:16,19, 20 18:17,18 19:13 70:10 92:20

**deposition** 4:3,13 7:2 9:9,24 16:8,20 17:19,22,24 18:5, 11,14,22 30:21 78:17 81:9 85:7

89:6 91:22 108:16

**depositions** 18:8
88:5,16 89:22 91:7

**details** 75:24

**determine** 87:15

**developed** 56:8

**developing** 74:9

**differences** 67:20

**different** 10:3
28:20 39:12 44:16
47:23 48:10 52:10
66:17,18 67:18
99:11

**differentiates**
86:20

**difficulty** 8:23
92:21

**direct** 39:19 88:24

**direction** 47:14
107:22

**directly** 57:14

**disagree** 33:3
101:2

**disagreed** 104:2

**disclosures** 40:9
79:13

**discovery** 20:7,17
31:10 85:7

**discuss** 17:19,22,
24 37:13 38:4,20
66:3,8

**discussed** 35:17
37:20 97:17

**discussing** 37:15

**discussion** 60:2

**discussions** 21:16

**dispute** 24:12
40:11

**dive** 56:15

**document** 9:17,22
12:15 13:6 20:18
25:17 30:22 31:5,8
32:7 50:14,24 51:7,
21 104:9

**documentation**
16:3

**documents** 13:10,
24 18:4 20:17 56:4
60:8 63:10 81:2

---

dollar 77:6

**dollars** 72:7 76:24

**double-check**
42:12

**Doug** 18:20

**drive** 58:2

**driver's** 4:9

**driving** 49:1 64:24

**drove** 56:14 59:1

**due** 91:22

**duly** 4:9

**dump** 74:16

**duplex** 99:6

**dust** 6:6 28:24
51:16 73:10 84:3,13
85:21 103:24

**duties** 71:8

---

**E**

**earlier** 35:3 58:12
81:20 90:22 94:18
96:5 101:9 105:11,
21

**early** 89:19

**easier** 20:22 23:15

**effect** 102:22

**elicit** 85:16

**else's** 23:2

**email** 14:9,12,15
15:3,6 36:23 37:1
89:1

**emailed** 15:11

**emails** 14:5 15:2,
18,23 89:9

**emanating** 73:6

**employed** 70:12

**end** 9:1

**ends** 100:9

**engage** 84:23

**enjoy** 84:12

**enjoyment** 6:5

**entailed** 6:18

**entered** 43:20

**entering** 41:18
74:21

---

**entirety** 100:9

**entitled** 31:3 73:16
75:13 81:13

**especially** 5:4

**established** 6:13
35:10

**establishing** 87:17

**estate** 70:16 86:5,8,
16 106:6 107:6,9

**evening** 75:19

**event** 85:19 87:19
88:11 96:12

**events** 34:1 101:4

**everyone's** 79:22

**exact** 36:5

**exactly** 14:15,16
69:3 76:21

**exam** 10:16

**examination** 4:7,
17 80:20 87:20
105:10

**examined** 4:10

**example** 46:2
69:17 100:15

**except** 40:23

**exchange** 15:7
22:15 74:16 75:22

**exchanged** 14:5
15:17,23

**Excuse** 79:20

**executed** 81:17

**Exhibit** 4:3 9:9
12:9,20 16:4 20:1
25:14,15,21 30:21
37:17,22 38:15
39:15,17 41:9 42:5,
24 43:5 44:7,10,12,
19,22,24 45:20
46:13 48:19 53:1
54:4,10 58:8 59:11
60:3,13 62:19 66:14
67:3,17 68:13 69:4,
6,8 70:7 73:13 75:5
77:23 79:14 81:7,9,
12,15 82:3 87:24
89:5,6 90:20 95:16
97:23 98:18 100:3
101:12,14,16
103:11

**exhibits** 57:10

**expectation** 77:5,

---

19

**expecting** 76:23

**experience** 103:14
106:6 107:5,9

**experienced**
51:11,16

**explaining** 77:11

**extent** 81:3

**external** 107:10

**extremely** 76:16

---

**F**

**facility** 24:20 25:11,
12 27:16,22 28:3,7,
10,11,13,17 30:10
46:19 68:10 69:24
70:3 106:24

**facility's** 106:12

**fact** 8:7 15:3 35:18
44:18 77:1 78:20

**factor** 107:1,11

**facts** 39:7 76:19

**fading** 30:15

**fair** 16:18 26:1 65:9,
17,22 66:1 74:19
86:23

**fall** 91:14,17

**Fama** 5:17 11:18
16:10,11 43:10 57:9
68:13 91:2 101:15
105:4

**familiarize** 9:14
31:20

**family** 99:3

**favor** 74:24 75:3
102:17

**federal** 50:15

**feel** 12:13 103:4

**Fernandez** 18:19
68:7,16,24

**Fernandez's** 68:2

**figure** 10:3 74:17

**figures** 76:19

**file** 11:2

**filed** 6:3 23:22
72:18

**fill** 46:21,22 48:8

---

66:22

**filled** 44:11 48:19
49:2 66:19 67:3,4,
11 68:20 78:3 83:7,
9 105:14

**final** 32:18

**financially** 74:21

**find** 13:17 15:14
25:10 50:4 69:15
78:4 95:7

**Fine** 56:24

**finish** 8:9

**finished** 65:7

**firm** 88:4

**firm's** 13:2

**flip** 43:4 101:17

**flipping** 31:14

**Florida** 93:19 94:9,
10

**follow** 86:16

**follow-up** 96:20,22

**follow-ups** 105:7

**following** 41:19

**follows** 4:10

**foregoing** 38:16

**forget** 89:2

**forgive** 36:4 85:4

**form** 81:24 82:5
83:5 103:11 104:3,5

**formed** 71:22,23

**forward** 60:11

**foundation** 21:8
27:8 37:7

**fourth** 40:24 58:15
88:11

**frame** 88:6

**free** 12:13 75:23

**Friday** 16:17 95:18

**front** 57:3,10 81:11
100:3 101:13 104:6

**froze** 26:20,22,23
48:15

**frustrated** 72:2

**full** 5:8 89:12 90:3

**G**

garner 49:17 85:10

gave 53:15 60:16
105:15,18,23

general 23:1

generally 10:21
64:4 74:24 75:3

generically 11:6

gentlemen 80:12

girlfriend 68:8

give 7:14 9:5 12:14
31:24 47:1 76:18

giving 24:20

global 49:14
101:10

go-round 77:7 93:5

good 4:18 11:7
23:14 108:10

Goodwin 5:14

graciously 4:20

graduate 10:14

grant 71:10

Great 7:21 9:7
20:14 32:3 40:3
42:19 44:16

ground 7:8

guess 79:19

guys 11:19

**H**

hand 37:3 79:14
98:4,5,18

handing 37:17

handy 43:4

happened 73:2

happy 8:2

harangued 36:6

health 91:23 92:3,9

hear 8:16 9:2 11:19
14:21 24:1 44:14
78:21 79:2 82:8
93:14

heard 4:24 24:24
86:22 87:3

hearing 8:24

held 34:3

hinted 63:20

hitting 29:19

home 5:20 13:8
50:5 51:17 64:2
83:14,18 91:22 92:4
99:11

homes 86:17
106:12

honestly 89:3 96:9

hope 78:22

hopefully 4:22 5:6
20:21 23:14 32:10
80:6

hoping 77:21

horrible 76:16

host 74:9,14,15,19,
24 75:3,20 77:1,3

hot 94:10

hour 71:4

hours 19:1

house 56:14 58:3
59:2 62:4 92:14
99:3,4 102:11

hundreds 72:7

hurt 48:6

**I**

i.e. 93:19

idea 23:22 38:8
47:9 62:15 77:13
107:3

identification 4:4
81:10 89:7

identified 4:8
45:23 55:11 73:20

identify 5:20 12:19
30:23

ignore 14:23

illegible 62:24

imagine 61:3 72:24

impact 51:21
107:11

impacts 107:1

impair 9:4

important 5:3 7:11

in-house 95:6

included 47:5,10

including 40:19
41:17 88:7

increased 106:11,
17,20

independent
95:10

indicate 25:8 56:11
58:5 103:23

indicated 45:10

indicates 40:6

indicating 55:5

individual 65:14

individually 49:12

individuals 18:21
19:23 27:18 36:16
41:23 51:15 66:3,8
67:17 101:11

inform 52:11

information 14:19
44:9 45:7 49:11
68:19 76:13,14
100:13

informed 10:1
50:23 57:15,22
64:17 105:22

informs 8:18

initial 22:12 23:8
40:7,19 41:19 42:15
43:21,23 45:8,12,13
47:20 50:19,21
52:16,22,24 53:10
54:6,7 55:14 64:10
65:24 66:1,15 67:21
77:24 78:13 79:8
87:23 93:24 105:18
108:11

initially 98:9,14

injuries 91:14,17

Innovations 75:21
76:7

installed 26:13

instructed 108:6

instruction 47:1
107:21 108:8

instructs 8:18

intended 42:23

interest 21:24

interested 17:10

interfered 6:5

internal 107:1

**Interrogatories**
31:5

interrogatory
32:13,19 39:18,22,
23 41:12 43:5,12
45:1,4 54:5 58:13
90:21 91:1 100:5,8,
14 101:1,6

interrupted 85:12

interrupting 85:5

introduced 4:18
5:23 34:19

introduction 88:19

investigation
32:21

involve 14:3

involved 33:24
73:5,9 101:5

involvement 23:4

issue 25:12 26:17
37:10 78:21 97:2,
15,16 100:17

issues 7:4 50:5
77:18

Itemlive.com.
75:12

items 37:16,20

**J**

Jack 15:23 17:22
24:5 33:19 36:14,22
53:12 54:15 56:1,2,
11 57:22 58:2 59:1
65:1 81:21,22
105:19 106:3

January 75:15
77:21

Jim 24:5 36:14

job 56:18 76:16
77:11

John 18:19 19:15
69:21 70:10 88:12,
13 93:7 98:11

July 22:8 25:22
29:14,17 40:9,13
41:7,20 42:16 43:1

45:14 53:21,24
54:1,2,3,8,10,14,15
57:19 82:2 88:6
89:3 91:7 93:19,24

jump 77:22

jumping 60:21

June 23:19 24:2
27:12 28:14,21
29:11,14 33:8,9
34:12,15 35:5 42:15
43:1 54:1 81:23
82:1,2,4 83:22 84:8,
19 86:2 93:24

**K**

Keeping 41:9
44:24

kids 85:3

kind 11:5 29:9 39:9
47:19 62:23 95:16

knew 24:11 29:15
33:14

knowing 17:10
28:22

knowledge 35:1
96:18,24

**L**

lag 5:5

landfill 72:12 74:16
75:22

larceny 6:20

late 88:6

Laura 4:21 5:10
12:19 15:9 31:13
40:24 42:14 48:15
52:16 59:20 81:7
89:8 104:23

law 10:8,12 11:10
12:1

lawsuit 14:3 23:17
24:8 26:3 28:23
35:6,17 49:18 50:3
51:8 52:3 72:2,3

lawsuits 73:4

lawyer 10:6 29:24
34:24

lawyers 52:13

leaf 42:20 43:15

learned 23:16 26:3 27:3 32:21 33:10

learning 35:6 88:7, 14

leave 91:21 92:3,14

legal 12:2 51:21

lengthier 30:22

Leo 5:17 14:22 105:2

letter 13:2,14 16:4

letterhead 13:2

letting 31:20

license 4:9 70:16

licensed 10:6 86:5, 8

licenses 71:10

Liddle 13:3 52:2,13 66:9

life 19:2 24:21 26:9 48:6 83:2 99:9

limited 85:8 87:13

list 67:17,18

listed 37:16 86:11, 13,15

lists 41:23

litigation 50:1 66:5 72:7,10

live 27:23 68:9 82:16,23 98:22,24

lived 25:11 26:9 46:19 82:19,20 83:1,3 99:9

lives 30:9,10,12,13

living 82:23

Liz 18:18

location 99:1

long 34:3 56:23 82:19 86:8 92:15

longer 94:7

looked 58:12 59:15 107:10

lose 72:3

losing 72:8

lost 72:22,23,24

lot 23:15 57:7 72:9 99:5,6

loved 94:9

lump- 75:23

**M**

made 8:20 26:4 27:5,20 29:15 30:3 32:22 33:15 47:20 71:19 78:20 98:6

mail 90:2

make 5:11 7:17 8:1 14:24 17:16 20:22 21:24 23:15 24:23 30:24 35:22 42:13, 19,22 47:18 52:9 57:9,13 58:6 64:14 66:15 71:4 101:14 105:7 106:19

making 15:4 76:19

manager 71:10

Manoogian 28:5

Marchese 18:18

mark 81:7 89:4

marked 9:9 12:8 16:4 25:14 30:21 42:5 59:10 73:13 75:5 81:10,12 89:7

market 86:23

mass 5:22 10:12 107:6

Massachusetts 4:9 13:5

matter 36:10

matters 6:21

Mckenna 75:14

means 38:5 39:6,12 70:19,21 74:13

meant 38:21

medical 78:21

medications 9:3

meet 6:10 35:15 77:14

meeting 33:9 34:12 35:5,9,10,13 66:2 77:16

member 11:13,15, 17,22

members 74:8

memorializing 49:4

memory 81:1 82:4

mentions 76:6

message 95:17

messages 13:15, 20,21

met 34:11,15,23

Michael 55:8 95:6 96:20

Michelle 24:6 36:14

Michigan 70:20

mike 79:4 96:7

mile 68:11 82:18,22

million 75:24 76:24 77:5

mind 56:8,20

minute 26:22 41:10,13 43:7 45:3 48:16 58:11 65:16 66:2

minutes 9:14 42:6 43:14 56:21 59:17 75:6 80:4 104:19

missing 69:10

mobility 92:15

moment 25:13 104:19

Monday 89:13

monetary 74:17

month 36:10 93:19

monthly 13:17

months 80:24

moots 29:9

morbidly 92:12

morning 96:11

motion 69:14

move 50:20 61:5,7 69:18 82:14 87:22

moved 82:20 93:18,21,22 94:3

mute 95:20 96:6

mutually 10:4

**N**

nagged 35:21

named 18:22 45:11 102:1

names 41:18 43:21 53:2 88:2

Nato 24:6 36:14

needed 49:8 56:9 58:2

negative 86:24 87:5

negatively 107:1, 11

neighbor 19:18 106:18

neighborhood 27:14 82:16 83:9,11 86:12,14,17 87:4 103:2

neighborhoods 73:7

nephew 78:7,8 91:12

news 75:11

newspaper 73:15

noise 24:19 28:5

normal 7:15

Nos 4:3

note 85:6

noted 60:4 85:15, 19 87:15

notes 47:19 49:4,7 80:6

notice 4:14 83:17 84:2

noticed 89:23 91:6, 7

Notwithstanding 12:1

November 71:15 73:18,21 74:3

noxious 83:17

number 89:15 94:22

numbers 89:21 90:6

numerous 84:12

Nuzzo 88:10 91:21 92:3,6,15,19 98:20 99:20

Nuzzo's 92:23 99:13

**O**

O'FRIEL 55:8 95:7 96:1,20 97:13,18

oath 101:20

obese 92:11,12

object 12:3

objection 8:19 11:23 12:4 21:6 26:8 27:6 28:18 29:2,8 33:22 34:5 35:8 36:1,18 37:7 39:3 47:7,11 48:11 49:19 50:16 52:15 53:4,23 55:19 61:22 62:1 64:22 65:20 66:6 67:14 85:5,15, 19 87:8 97:11 106:2

objections 8:16 31:4 40:6 87:15

observe 59:3 61:16

observed 61:11

obtain 60:23 63:22 64:16 65:1 92:7

obtained 21:3 60:18 66:20 100:21 102:4

obtaining 35:19 56:12 70:7 85:8

obviously 31:9,15 54:13 56:15 61:8 67:21 82:15 93:9 100:19

occasion 25:20

occurred 90:18

odd 62:2

odors 6:6 24:19 27:15 28:16 48:4 51:12 73:6 83:17 84:13 85:21 103:14, 24

Oetheimer 5:10, 13,14 6:10 9:11 11:23 12:10,18,23 14:6 15:7,9,16 17:20 21:6,8 26:8 27:1,6,8 28:18 29:2, 7 31:13,22 33:22 34:5 35:8 36:1,18 37:7,17 39:3 40:23 42:14 43:9 47:7,11

48:11 49:19 50:16
52:15 53:4,23 55:5,
19 59:19,22 61:5,7,
22 62:1 63:3,8
64:22 65:20 66:6
67:14 69:10,13
79:14 80:17,20 81:6
82:14 85:14,20
87:14,23 89:4,8,14,
18 91:20 93:7 94:13
97:7 104:18,23
106:2 108:15

**offer** 17:17

**offered** 14:19

**offering** 75:23

**office** 70:23

**official** 103:5,7

**operating** 75:22

**opportunity** 6:10
12:16 31:12 32:6

**opposition** 37:8

**Opt** 75:13

**opted** 75:19

**order** 12:11 71:19

**original** 51:24

**originally** 68:3,4

**outdoor** 84:14,23

**outreach** 32:23
33:20,21

**overlap** 69:17

---

**P**

**p.m.** 108:16

**pages** 31:6 41:12

**paid** 71:3

**paragraph** 32:17,
18 37:23 40:4 43:18
45:6 54:6 58:15
73:23 74:6 75:18
76:6 84:2,12,16
85:20 91:9,19 93:6
94:12

**Pardon** 61:6

**part** 25:16 27:20
32:20 40:17 45:6
73:24 74:7 79:12
82:9 86:20,21

**particular** 25:20
31:16 34:13 35:24
39:10

**parts** 44:11

**passes** 77:4

**passing** 77:10

**past** 6:21 39:9

**payment** 75:24

**penalty** 38:16
50:24

**pending** 49:24 50:3
66:5 75:24 76:12

**people** 10:23 14:19
18:7 19:13 21:3,13
24:19 25:5,10
27:15,21,23 28:6,
16,22 29:16 30:3
33:14 36:2,9 46:13,
19,21 47:16 49:7,
17,23 50:2,9,13,23
51:6 52:12 53:1,7
55:1,10 56:9 57:8
58:7 60:18 61:18,24
62:6,13 63:21 64:9,
13,15,16,17 65:10
66:17,18 68:18 70:9
88:5,14,20 89:22
91:6 92:19 98:7,8
99:21 100:1 102:6,
7,10 103:10 104:9
106:12 107:17
108:7

**people's** 56:13
88:2

**percent** 92:5

**Perfect** 57:5

**period** 13:18

**perjury** 38:16 51:1

**permission** 53:6
64:6 78:12

**person** 35:13 37:3
39:6 45:23 48:10
51:11,23 53:6,13
63:22 65:19 67:2

**personal** 34:1
43:24 64:18 65:1
87:21 102:24

**personally** 34:9
46:20 55:11,16 56:9
64:16 101:24 102:4

**Peter** 28:4

**phone** 13:13 19:17,
19 29:16 33:15
35:10 47:20,23
48:9,21 51:24 65:24
68:19 78:12

**phones** 13:17

**physical** 36:20
99:11

**physically** 59:4
61:12,16 101:24

**pickle** 102:21

**piece** 26:15

**pile** 12:11

**places** 62:5

**plaintiff** 4:7 29:5
31:4,10 88:4

**plaintiff's** 47:6

**plan** 31:19

**plant** 72:12 82:17
83:11 87:4

**played** 85:2

**plenty** 31:24

**point** 6:9 7:24 8:7,
13 22:6 25:18 30:2
33:13 36:16 40:16,
24 81:24 82:1 85:7
88:4,8 89:1 92:6
96:4 99:3 107:21

**pointed** 32:4

**policymakers**
71:9

**pool** 26:13 85:1

**poor** 24:20 77:11
91:22 92:3

**portion** 38:9 40:3

**pose** 8:10,16

**position** 34:4 71:3,
7

**positive** 86:23

**possession** 14:2

**possibility** 74:8

**possible** 4:23 5:7
8:7

**potential** 74:14

**power** 78:23 79:6,
7,17

**prefer** 56:19

**premarked** 4:4

**prepare** 16:8 47:18

**present** 8:15 14:7
71:7

**presented** 74:17

**presenting** 76:16

**pressure** 102:15

**presume** 6:9 7:22

**presuming** 105:2

**pretty** 11:7 48:7
80:5 86:18

**previous** 25:23

**previously** 9:8

**prior** 28:14,20
34:12 41:7 54:15
97:15

**probably** 36:2 50:2
58:11 82:6,10 99:4

**problem** 11:1
26:10,14 77:10
85:13 102:21

**problems** 28:10
48:4 72:12 103:23

**process** 4:23 22:1
30:18 32:11 73:24
74:7

**Procter** 5:15

**produce** 15:5
79:11,18

**produced** 21:1
22:4,7,18 23:3 29:4
31:9 40:12 42:9
59:15 60:6 89:9

**production** 25:17

**properties** 86:11,
14 87:3

**property** 6:5 26:15,
16 28:24 48:5 51:12
84:4,13,24 85:11,22
86:3,6,24 106:10,16
107:2,11

**proposed** 11:22
47:6,10

**provide** 8:21 12:5
104:15

**provided** 20:6,15
40:18 41:6 45:9
54:10 67:19 85:10
90:6

**providing** 89:21

**provision** 39:2

**proximity** 27:23
87:6 106:12,24

**Published** 74:3

**pull** 9:10

**pun** 42:23

**purposes** 4:15
22:10,21 25:19 76:5

**pursuant** 4:14
37:24

**put** 6:11 9:12 39:15
50:14 71:11 85:5
89:16

**putative** 6:2 11:12,
15,21

---

**Q**

**quality** 24:20 48:6

**quality-of-life** 50:5

**question** 7:21 8:2,
9,17,19 17:5 24:13
27:2 28:20 39:21
41:10 43:7 44:6
45:3 48:17 49:14
51:4 54:13 58:12
62:16 106:13
108:10

**questions** 12:2
29:20 48:7 52:3
80:4,11,18 85:15
87:16 101:10
103:10,12 105:3,5

**quick** 56:19

**quicker** 22:1

**quickly** 4:23 5:6
8:6

**quote** 40:17 42:15
43:18 58:15 59:1

---

**R**

**raised** 74:8

**ran** 70:23 71:1

**re-insert** 76:2

**reached** 35:23

**reaching** 89:18

**read** 12:15 18:11,14
31:18 32:12 33:1
38:2,18 39:22 40:21
41:2,10,21 43:7
44:1 45:3,15 58:21
59:6 74:11 76:3
84:5,16 85:23 89:12
99:16 100:4,7,11
103:11

reader 32:5

reading 31:15

reads 84:12 85:21

real 70:15 86:5,8,16
106:6 107:5,9

reason 40:11 99:24

reasons 98:13

recall 24:23 38:8
39:1 68:16,17 80:23
88:7,14,22 89:18,21
90:4,8,16 94:22
95:4,24 96:13 98:6,
13,16 102:23 106:1

receive 13:8 15:3

received 25:18,21,
22 37:6,12 38:7

recently 18:8

recess 57:1 80:9
104:22

recognizing 92:22

recollection 16:14
33:6 35:7 46:8
48:23 49:16 50:18
51:6,10,14 54:17
57:19 62:11 67:10
68:1,24 95:10,11,21
96:4 97:1 99:20

record 4:12 5:9,11
6:11 7:18 8:20
11:24 12:3,20 15:1,
4 17:9 20:5 30:23
31:2 42:8 57:5 60:1,
2,4 64:14 75:11
76:5 85:6 89:16
97:5 101:22

redundant 29:21

reelected 71:1

reelection 71:11

refer 9:7 22:2,11,22
31:17 90:20,23
98:4,19

reference 23:8
89:10

referenced 7:5
59:14 72:9 94:17

referencing 72:14
73:5

referred 90:22

referring 35:9 38:9
63:4 72:11

refers 91:9 95:22

reflect 4:12

refresh 16:14 81:3
82:3

regard 47:14

regarding 6:21
13:15 15:24 17:5
36:9 76:1 108:10

related 78:6

relates 50:21
100:24

relation 68:9

remaining 40:18

remember 7:7
14:12 16:22 24:9
25:7 36:5,12,20
37:15 53:19 55:23
64:24 65:5,7 96:9

remembering
88:10

repeat 36:24
106:13

rephrase 108:5

reporter 5:1,21
7:13,16

represent 6:2 13:1
20:5,14 31:2 42:8
59:13 73:15

representative
24:3 27:13

representatives
34:23 35:15 36:8

represented 6:13
8:14

representing 5:15,
17

request 14:24 20:7
32:22

requested 16:3

requests 13:14
31:11

resident 21:14 25:4
27:14 82:15 83:10
103:2

residents 6:4 21:4
43:22 45:11 58:17
83:8 100:21 102:1

resisted 103:16

resolved 7:5

respect 45:8 58:16
101:11

responded 105:24

response 20:7
31:10 39:23 41:15
42:2 44:3 45:17
58:23 59:8 61:10
95:2

Responses 31:4

result 106:11,17

retrieved 75:12

Revere 100:21

review 16:19 18:4
63:10

revised 75:14,20

Richard 5:14 14:5,
22 15:1 32:4 42:21
60:4 69:16 87:8
88:10 89:14 91:20
92:2 93:2 94:13
97:5 106:5

Richard's 98:20

right-hand 20:10

rights 51:21 66:4,
10

Robert 48:16 60:1
88:9 94:15,16

rolled 30:17

room 6:10 14:7

Rule 40:8

rules 4:15 7:8

running 34:22

Russo 69:21 98:11
103:18,19,23

---

**S**

Sara 78:3,24 79:6,7
88:9 91:10,11

Saroufim 88:12,13
93:7,10,17

sat 7:1 18:8

satisfactorily 4:8

Saugus 5:16,22
13:5 20:9 32:24
34:2 36:3 40:19
43:21,23 45:11
47:16 58:17 71:9
72:6,15 74:18,20
75:13 86:20 87:3

Saugus's 31:3

Saugus-009630
20:11

scheduled 91:8

school 10:8,12
11:10 12:1

scope 85:6,18 87:9,
13,18

script 47:18

scrubbers 26:13

search 13:22 16:2

section 67:4

seek 88:19 92:6

seeking 11:17
85:16

selectman 70:23

Selectmen 34:22
70:17,22 75:13,19
77:15

send 14:9

sense 8:1

sent 13:3 15:1,14

sentence 32:18

September 13:4

Serino 5:22 13:4
18:19,23 19:14,19
70:10 82:23 83:3,15

served 40:7 41:19
45:14 54:8 58:17

set 9:16 12:19,24
14:17 22:17 23:11
31:4 32:2,14,15
40:2 41:14 43:16
73:19 75:8 105:12,
13 108:6

sheets 4:12,17 5:12
9:12 12:12,21 13:3
14:24 15:12,17
21:10 29:4 31:19,23
35:12 37:19 41:1
42:17 43:11 48:15
52:2,13,17 57:2,12
59:21,23 60:3 61:6,
10 63:5 66:10 68:14
69:12,15 79:15
80:10 82:8,12 85:4
87:8 88:24 90:22
93:2 97:4,11 98:1
100:4,16 101:9
105:1,6,10 108:9

Sheets' 88:4

Shift 79:4

short 89:11

shortly 95:4

show 13:21 42:4
62:19 66:16,19,21

showed 17:6 66:23

showing 63:21
64:2

shown 92:21

side 98:22 99:7

sign 14:19 44:18
53:2,7 56:6,9 58:7,
20 59:4 62:6 65:11
69:1 78:12 94:19
98:11 102:6,13,15,
17,19,21 104:16
108:7

signature 19:7,9,
10 43:24 56:4 60:18
62:3 64:5,7,18
65:15,19 66:24
68:3,22 69:2 79:22
81:15 92:22,23 93:4
98:15 100:16

signatures 17:6
43:22 44:9 47:15
56:3,13 58:6 60:23
63:22 64:16 65:1
66:20 70:7 97:2,9
102:4

signed 14:18 40:20
43:20 53:16,24
54:21,24 55:11,16
61:16 62:7,20 63:7
64:11,20 67:21
78:14 79:8 80:1
83:21 84:7,18 86:1
88:2 90:9,13 94:18,
24 95:3,8 96:17
97:16 98:1 101:14,
24 102:20 103:13
104:9 105:23
107:23

significant 86:18

signing 41:18
50:24 51:20 61:12
66:4,11 103:16

similar 51:3

Similarly 51:14

single 72:3

sir 10:6

sit 50:8

sitting 6:23 10:18
11:12 38:11 41:5
47:9 48:14,18 49:15

50:12,22 51:5,19
52:23 64:8 68:15,23
73:1 78:23 79:24
80:12

**situated** 57:7

**slowly** 30:19

**smoother** 22:1

**so-called** 97:23

**sold** 86:11

**soliciting** 83:8

**soot** 24:19 26:12

**sort** 7:7 12:2 30:18
47:19 80:21,23 81:3
82:3 86:22 87:4,5
88:6,15 92:14,21
98:8 99:21

**sorts** 28:3

**sought** 76:2 78:17
88:5

**sounds** 65:4 79:2
107:16

**speak** 5:3 7:12
62:14

**speaking** 96:5

**specific** 38:9 39:2
44:7 49:16 50:18
51:5,10,14 62:10
68:24 76:20

**specifically** 11:5
25:8 30:11 31:24
37:15 43:17 68:2
72:10,14 73:2,8
76:14 78:4 90:23

**specifics** 17:15
26:2 29:23 32:9

**speculation** 61:9

**speed** 32:5

**spent** 65:14

**spoke** 24:3 36:9
45:10,23 46:9,13
48:20 55:8,9 70:9
90:3,10 91:20 93:7,
9 94:13 95:13 96:10

**spoken** 70:6 90:13

**squarely** 85:18

**Sr** 5:19

**stamp** 20:10,19
25:19

**stamped** 25:16

**start** 5:13 27:1
39:20 77:17

**started** 30:16 64:24
65:5 72:1

**Starting** 91:4

**starts** 100:9

**state** 5:8 42:7
106:24

**stated** 42:21 93:17,
18 98:13

**statement** 33:3
38:21 41:3 65:18
83:13,21 84:7,10,19
90:14 92:2,7 94:18,
20,24 106:20

**statements** 95:8

**states** 9:23 41:15,
16 43:18,19 45:6,7
58:15 94:12

**stay** 70:2

**Stephanie** 18:18
68:2

**Steve** 46:3

**stigma** 107:10

**stop** 74:2

**strange** 95:17

**streamline** 32:10

**street** 30:13 82:20,
21

**stretch** 56:21

**strike** 61:5,7

**strokes** 52:10

**stuff** 86:15

**subcommittee**
71:17,22 73:17 74:8
77:14,16

**subcontractor**
33:19

**subject** 12:4 40:5

**submitted** 64:10,
19

**submitting** 50:14

**subsequently**
90:8

**substance** 14:12

**suing** 72:15

**suit** 6:20 11:3

**sum** 75:24

**summer** 78:17
94:18

**superfluous** 87:12

**supplement** 67:23

**supplemental**
22:23 23:11 40:8
56:16,22 57:16,23
58:16 59:5,13 60:5,
11 61:12 63:23
66:13 67:19 69:20
79:11,13 80:1 93:3
97:24 99:14 101:16,
23 105:13

**sustained** 91:13,
16

**Sweetland** 6:2
20:8 21:1 23:17
27:5,21 29:5 30:1,7
33:11

**Sweetlands** 10:23
47:12

**swimming** 85:1

**sworn** 4:9

---

**T**

**table** 12:19 76:12,
18

**tackle** 56:22

**taking** 5:1 9:4
37:22 59:12 65:19

**talk** 13:16 14:2
18:9,21 19:5,12
23:7 30:17 33:14
36:13,15 61:18,23
62:13 80:14

**talked** 5:23 10:2
16:16 17:15,16 18:4
25:23 26:4 29:10
30:1,3 33:9 34:11
38:21 46:14 49:5
51:20,24 52:5 61:1
65:23 66:14 96:23
106:5 107:17

**talking** 15:20 22:3
23:2 25:15 27:3
50:19 52:20 54:5
60:11,12 62:9,11
64:15 72:18 74:14
76:8 93:2

**Teams** 96:10,13

**technology** 5:5

**telephone** 45:11
89:21 90:6 94:22

**television** 11:11

**telling** 49:16 51:6

**ten** 56:20 71:4
86:10

**tense** 39:9

**term** 79:21

**terms** 11:8 76:21

**testified** 4:10 33:13
35:3 87:10 88:24

**testify** 20:24 35:11

**testimony** 9:5
29:11 41:5 44:10,17
45:21 49:18,21,24
50:12,22 52:11,23
64:8 79:24 85:10
87:13 105:11,17
107:15

**text** 13:15,21 89:10,
11,17 95:17

**texted** 90:2

**thing** 8:5 12:14
19:16 73:10 107:14

**things** 9:1 14:22
20:21 23:15 30:17
47:19 80:23 100:24

**thinking** 70:1

**thinks** 63:6

**thought** 29:1 35:12
62:2 72:4 81:22
89:1

**thoughts** 26:5

**thousand** 72:7

**time** 7:1 8:11 12:15
13:18 19:6 23:16
24:15,17 26:18
29:12 31:11 32:1
36:7 37:5,11 38:7,
24 39:18 42:20
46:14 48:9,13,20
53:15 54:20 55:17
56:7 64:7 65:5,7,13
66:9 76:22 82:19
84:7,18 88:6 91:17
92:15 93:23 97:1,7
100:10 105:21,22
106:3,11

**timelier** 31:1

**timeline** 80:22 81:4

**times** 6:19

**timing** 46:12

**tipping** 75:23

**today** 4:21 5:2 6:1,
14,23 7:11 8:14 9:2,
4 10:5,18 12:15
13:11,16,21 14:2,7
15:20 16:8,16,20
20:5,19,23 22:2,12,
22 38:11 39:12 41:5
44:11,17 45:21 47:9
48:14,18 49:15
50:8,12,22 51:5,19
52:23 58:9 64:8
68:15,23 73:1 78:23
79:24 80:11 83:24
84:10,21 86:6 87:10
101:20 105:11,21
107:15 108:13

**told** 8:5 24:4,8 50:2,
13 54:20 55:1,15
64:9 79:22 90:12
93:11 106:3,4

**top** 27:2 90:24

**topics** 87:22

**tore** 99:5

**total** 31:7

**touch** 47:15

**touched** 7:10 57:13

**town** 33:24 34:2
71:9,10 72:3,14,22,
23 74:10,17,20
75:23 103:4

**traffic** 28:5

**transcripts** 18:12,
15

**trash-to-energy**
74:10

**triple** 104:7

**true** 38:17 39:7
83:19,21,24 84:7,
10,18,21 91:16

**Trust** 94:11

**truth** 85:9

**truthful** 9:5 87:11

**Tuesday** 75:19

**tunnel** 79:3

**turn** 9:1 45:1 53:11
96:6

**turned** 55:14

**two-page** 31:6

**types** 84:23

---

**U**

**U.S.C.** 37:24 38:11

**uh-huhs** 7:14

**uh-uhs** 7:15

**ultimately** 92:19 98:11

**understand** 6:7 11:15 20:23 21:3 22:6,17 78:16,18 80:22 85:14 88:1 100:13 101:19

**understandable** 98:17

**understanding** 6:1 9:21 10:22 11:6, 8 12:5 23:1 24:14, 17 37:5 39:1,10,12 44:8 47:13 56:8 87:1 92:10 106:8, 15,23

**understood** 7:19, 22 8:21 10:1 19:11 23:5,12 52:18 54:11 68:14 71:6 72:21 77:12 80:3 82:12 106:9 107:5 108:3, 11

**unnatural** 84:3

**unusual** 84:2

---

**V**

**Vague** 26:8

**valuation** 106:10

**value** 85:22 86:3,23 87:5

**values** 106:10,16 107:2,12

**vein** 44:17

**Venice** 83:1

**veracity** 85:9,16

**verbiage** 36:5 70:20

**versus** 20:8

**visit** 92:6

**voice** 90:2

**volunteered** 61:9

**vote** 71:19 75:13,19 76:11 77:14

**voted** 76:12

**votes** 77:9

---

**W**

**wait** 12:21

**waiting** 76:15

**waiving** 40:5

**walk** 30:18

**walked** 62:5,7

**Walsh** 15:24 17:22 24:5 32:22 33:6,18 34:7,11,19,24 35:7, 18,21 36:12,14,22 37:11 38:4,20 39:1 53:12,15 54:15,20 55:15 59:1 60:22 61:11,15,18 81:21, 22 97:20 102:6 105:19,22

**wanted** 25:8,10 47:19 49:7 57:9 58:6 95:7 104:20 107:14

**Waste** 75:21 76:6

**wasting** 72:6

**WB** 20:11

**weeks** 29:16

**west** 87:4

**whatnot** 13:20

**whatsoever** 87:10

**Wheelabrator** 5:16 6:6 8:15 11:1,3 20:6,9,16 22:4,7,18 23:18 24:3 25:16 26:11,16 27:12 28:15 29:1 31:3,9 32:20 33:20 34:8, 10,23 35:15 36:8,13 40:6,8,12 41:6,15, 16,20 42:10 43:19 45:7,14 48:5,6 50:3, 6 51:17 54:8,23 58:18 59:15 60:6,16 61:4 71:17 72:2,15 73:6,16 74:1,7,15, 22 76:9 82:22 87:6 88:18,19 91:12 95:6 97:8,21 103:21,24 106:18 107:19 108:1

**Wheelabrator's** 14:6 37:9 39:23 89:14 90:21

**whichever** 104:6

**whomever** 27:11

**Wickedlocal.com** 73:16

**William** 5:19

**WIN** 75:14,20 76:6

**witness** 4:6 82:10 85:13

**word** 37:24 93:16

**words** 93:14,18

**wordy** 7:24

**work** 9:13 72:1,5

**worked** 69:24 103:21

**working** 34:8,10 70:3 77:17

**worth** 86:6,17

**wrapping** 80:5

**written** 47:18

**wrong** 35:4 77:24 79:20 105:17 107:16

---

**Y**

**yard** 85:3 102:7

**year** 71:5 72:19,20 76:24 77:6 85:2

**years** 10:13 12:1 82:20 83:2,5 85:1 86:10 92:16 106:21

**yelling** 79:3

---

**Z**

**Zoom** 96:8,9,12